948 F.2d 1358
 Fed. Sec. L. Rep. P 96,400
In re IVAN F. BOESKY SECURITIES LITIGATION,
William Fries, II, John Lippitt, Jacquelyn Tribolet and
William Nelson Harris, Trustee under the William
Nelson Harris and Myrtle Whitsett Harris
Trust, Plaintiffs-Appellants.
 No. 1947, Docket 91-7433.
 United States Court of Appeals,
Second Circuit.
 Argued July 22, 1991.
Decided Nov. 12, 1991.
 
 David B. Gold, San Francisco, Cal. (John W. Allured, George S. Trevor, David B. Gold, P.C., of counsel), for plaintiffs-appellants.
 Stanley Nemser, New York City (Wolf Popper Ross Wolf & Jones, New York City, David Berger, Berger & Montague, Philadelphia, Pa., Lead/Liaison Counsel), for plaintiffs-appellees and for plaintiffs in Class and Shareholder Trading Actions in MDL 732.
 Charles E. Davidow, Washington, D.C. (Robert B. McCaw, Brian X. Gaul, Wilmer, Cutler & Pickering, of counsel), for defendant-appellee Ivan F. Boesky.
 Steven B. Rosenfeld, New York City (Jonathan H. Hurwitz, Paul, Weiss, Rifkind, Wharton & Garrison, of counsel), for defendant-appellee Michael R. Milken.
 Alan R. Friedman, Robert A. Culp, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel, for defendants-appellees MAXXAM Group, Inc., Federated Development Co., MCO Holdings, Inc., MAXXAM Properties, Inc., MCO Properties, Inc., Pacific Lumber Holdings, Inc., MXM Corp. (Maine), The Pac. Lumber Co., and Charles E. Hurwitz.
 Timothy E. Carr, Gilmur R. Murray, Michael T. Healy, Carr & Mussman, San Francisco, Cal., of counsel, for defendants-appellees Former Directors of Pacific Lumber Co.
 Edwin B. Mishkin, Jessica Sporn Tavikoli, Cleary, Gottlieb, Steen & Hamilton, New York City, of counsel, for defendant-appellee Salomon Brothers, Inc.
 Loyd Derby, Nancy Mayfield, Morgan, Lewis & Bockius, Los Angeles, Cal., of counsel, for defendant-appellee Jefferies & Co.
 Ronald L. Ripley, Linn & Helms, Oklahoma City, Okl., of counsel, for defendant-appellee Boyd Jefferies.
 Stuart J. Baskin, Shearman & Sterling, New York City, of counsel, for defendant-appellee Wickes Companies, Inc.
 Before WINTER, ALTIMARI and MAHONEY, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This is an appeal by four members of a class from orders approving partial settlements of a class action. The eleventh-hour objection that the settlements were entered into without authority is meritless. The settlements are fair and reasonable. We affirm.
 
 BACKGROUND
 1) Overview of M.D.L. 732
 
 2
 The partial settlements at issue arise out of In re Ivan F. Boesky Securities Litigation, M.D.L. No. 732 ("MDL 732"), in the Southern District of New York. MDL 732 is extremely complex. It involves thirty-five separate securities transactions that were allegedly tainted by violations of various state and federal laws. The defendants include Ivan Boesky, Michael Milken, Dennis Levine, and Martin Siegal. MDL 732's class and shareholder actions involve six certified classes, thirteen certified subclasses, two subclasses sub judice for certification, and eighteen subclasses for settlement purposes only. It comprises more than twenty-seven actions originally filed in various districts and later transferred to the Southern District of New York, where they were consolidated before Judge Pollack. MDL 732 also includes two actions, SEC v. Drexel Burnham Lambert, Inc., 88 Civ. 6209 (MP) (S.D.N.Y.), and SEC v. Milken, 88 Civ. 6209 (MP) (S.D.N.Y.), coordinated for pretrial proceedings. It is also affected by the Drexel Burnham Lambert Chapter 11 bankruptcy proceedings, certain federal criminal proceedings, and various Securities and Exchange Commission ("SEC") proceedings.
 
 
 3
 Also relevant is an SEC enforcement proceeding, SEC v. Ivan F. Boesky, 86 Civ. 8767 (RO) (S.D.N.Y.). That action produced a settlement (the "Boesky Final Judgment") that created the Boesky Civil Disgorgement Fund ("Boesky Fund"). The Boesky Fund presently exceeds $65 million. It is to be used, inter alia, to satisfy claims under the terms of the partial settlement stipulations that are the subject of this appeal. The Boesky Final Judgment calls for disbursement of the Boesky Fund, pursuant to a court-approved SEC Plan, to claimants who can establish the existence of a valid claim. The claimants fall into two categories: (i) a First Tier group consisting of MDL 732's Class I, Subclasses 1-6 plaintiffs; and (ii) a Second Tier group, subordinate to the First Tier, consisting of persons with other valid claims against Boesky or entities allegedly under his control.
 
 2) Lead/Liaison Counsel
 
 4
 In early MDL 732 proceedings, the district court designated Stanley Nemser and David Berger as Lead/Liaison Counsel for plaintiffs in the class actions involving alleged trading improprieties by defendants. Their duties were later expanded to include representation of all plaintiffs asserting claims of trading improprieties whether or not those claims were brought by a class. At present, Lead/Liaison Counsel are also authorized by order of the district court to act on behalf of the 231 named plaintiffs in the Fourth Consolidated Amended Complaint. On July 10, 1989, the district court vested Lead/Liaison Counsel with substantially all of the responsibilities delineated in the Manual for Complex Litigation, Second, § 41.31 (1985) ("MCL 2d"). As such, Lead/Liaison Counsel were charged with coordinating communication and discussion among the twenty-seven other law firms who represent named plaintiffs or class representatives and with maintaining contact with Lead/Liaison Counsel for plaintiffs in the nonclass actions (including the SEC) as well as with counsel for the defendants. As part of their duties, Lead/Liaison Counsel have conducted lengthy settlement discussions with counsel for defendants.
 
 3) The Objectors
 
 5
 Plaintiffs-Appellants William Fries, II, John Lippitt, Jacquelyn Tribolet, and William Nelson Harris, Trustee under the William Nelson Harris and Myrtle Whitsett Harris Trust ("Objectors") are former shareholders of the Pacific Lumber Company ("Pacific Lumber"). They are four of the 187 individuals asserting claims against settling defendants in connection with the hostile takeover of Pacific Lumber by MAXXAM Group, Inc. ("MAXXAM"), in 1985. The Objectors are represented by David B. Gold, P.C. ("Gold firm," "Gold"). The remaining 183 Pacific Lumber plaintiffs, represented by separate counsel, were named parties in American Red Cross San Francisco Bay Area v. Hurwitz, a securities action consolidated with MDL 732 by order of Judge Pollack on November 20, 1989.
 
 
 6
 Three of the four Objectors (Fries, Lippitt, and Tribolet) moved for certification of a Class VI, and on September 24, 1990, Judge Pollack certified Class VI--consisting of all persons who tendered, exchanged, or sold shares of Pacific Lumber common stock in connection with a hostile takeover of Pacific Lumber by MAXXAM in 1985. The Pacific Lumber stockholders alleged that Boesky engaged in illicit and undisclosed stock parking violations to avoid the anti-takeover provisions of Pacific Lumber's charter and used false and misleading materials in connection with the tender offer. At the time of certification, Judge Pollack designated Harris and the other three Objectors as class representatives for Class VI. The Gold firm has represented the Objectors at all pertinent times. The four Objectors are the only members of the plaintiff classes--amounting to 80,000 individuals or entities--that have objected to the partial settlements.
 
 
 7
 4) Lead/Liaison Counsel and the Settlement Negotiations
 
 
 8
 After consolidation, Lead/Liaison Counsel took the lead in exploring the possibility of, and then negotiating, a settlement with the settling defendants. The settlements were negotiated over a period of two years as new actions, new plaintiffs, and new certified classes were added. Other plaintiffs' attorneys did not participate in direct negotiations with the settling defendants.
 
 
 9
 Nevertheless, during the course of the negotiations, Lead/Liaison Counsel convened meetings of the plaintiffs' attorneys at which the developing terms of the settlements were reported and discussed in the hope of arriving at a consensus. Because of concern about the risk of leaks to the press arising from the large number of attorneys, no written drafts of the proposed settlement stipulations were circulated during the earlier meetings. Instead, Lead/Liaison Counsel gave oral accounts of the settlements' developing structure.
 
 
 10
 Three meetings are especially germane to the instant appeal. These were held on June 15, 1989, November 29, 1989, and April 17, 1990. At least one representative of the Gold firm was present at each meeting. The June 15, 1989 meeting included a report on the status of the negotiations and presentation and discussion of various proposed settlement terms. The source of the present controversy--the judgment-reduction provisions described infra--were disclosed at this meeting. The November 29, 1989 meeting included a full oral presentation of the proposed settlements and the related SEC Plan for partial distribution of the Boesky Fund. Again, the judgment-reduction provisions were disclosed. At the April 17, 1990 meeting, Lead/Liaison Counsel distributed written drafts of the settlement stipulations, including their judgment-reduction provisions. A detailed discussion of the contents of the proposed settlements followed. In addition to these meetings, Lead/Liaison Counsel remained in contact with the Gold firm throughout the course of the settlement negotiations.
 
 5) The Settlement Stipulations
 
 11
 The settlement stipulations are largely identical. They involve four of MDL 732's classes, twelve of its subclasses, eighteen settlement subclasses and all the named plaintiffs in the various class actions, individual actions, and derivative action that constitute MDL 732. Each stipulation purports to have been entered into by the named plaintiffs, including the Objectors, and the plaintiff classes.
 
 
 12
 The first stipulation involves defendant Ivan F. Boesky and various entities allegedly under his control. This stipulation provides that judgment shall be entered against these defendants for $45 million in favor of certain classes, subclasses, and settlement subclasses, among them Class VI. The judgment is to be paid from the Boesky Fund created by the Boesky Final Judgment in SEC v. Ivan F. Boesky, 86 Civ. 8767 (RO) (S.D.N.Y.).
 
 
 13
 The Boesky Final Judgment defines "valid claim" as "amounts the Defendant BOESKY agrees to pay in settlement of any federal or state claims arising out of securities transactions by entities over which the Defendant BOESKY exercises or has exercised investment or operational control." Significantly, this stipulation establishes that all claims settled therein are "valid claims" for purposes of both the First and Second Tier securities transactions as categorized in the Boesky Final Judgment. In this stipulation, the settling defendants consented to an allocation by the SEC of a sum in the range of $28 to $30 million for distribution to the First Tier (Class I, Subclasses 1-6) class members. The remainder will be distributed to Second Tier claimants and other claimants not parties to the settlement agreement.
 
 
 14
 The second stipulation involves defendants CX Partners, L.P., Seemala Partners, L.P., certain of the Limited Partners of CX Partners, and MaraBill, L.P., an affiliate of CX Partners and Seemala Partners. This stipulation requires CX Partners to guarantee distribution of at least $4 million in the aggregate from the Boesky Fund to members of the classes and subclasses having valid claims concerning Second Tier security transactions and to make payment to the extent that the amount distributed from the Boesky Fund to Second Tier claimants is less than $4 million in the aggregate.
 
 
 15
 The third stipulation involves defendants Cambrian & General Securities, p.l.c., Farnsworth and Hastings, Limited, and Farnsworth's affiliate, F & H Associates, C.V. It requires those defendants to pay $1.8 million in cash into the Boesky Fund and to guarantee distribution of up to $2.5 million above the $4 million provided for in the second stipulation.
 
 
 16
 With some qualifications not relevant here, each stipulation provides that all claims of the named plaintiffs and members of the plaintiff classes against the settling defendants are extinguished. The stipulations also provide that the final agreements have no effect on the rights of plaintiffs against the nonsettling defendants in the MDL 732 action. The settling defendants also agree to assist the SEC in the formulation of a plan of distribution for the disbursement of the Boesky Fund and to provide information to the plaintiffs potentially useful in the litigation against the nonsettling defendants.
 
 
 17
 The provisions challenged by the Objectors are the judgment-reduction clauses in each stipulation. They provide that plaintiffs will "reduce or satisfy" any judgment against a nonsettling defendant "to the extent necessary to extinguish any claims of such non-settling defendant for indemnity or contribution from [the settling defendants], as may be determined by the Court or jury." The plaintiffs' duty to indemnify the settling defendants is limited to claims arising out of the subject matter of the claims released by the plaintiffs in the settlement stipulations. The duty to indemnify cannot exceed the amount of the plaintiffs' recovery from the nonsettling defendants and thus cannot diminish what is received as a result of the settlements. The stipulations do not determine the method by which such judgments will be reduced, i.e., comparative fault, see Franklin v. Kaypro Corp., 884 F.2d 1222, 1231-32 (9th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990); pro tanto, see Singer v. Olympia Brewing Co., 878 F.2d 596, 600-01 (2d Cir.1989), cert. denied, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990); or other rule.
 
 
 18
 One purpose of the judgment-reduction provisions is to allow the settling defendants to buy peace from these plaintiffs. Another is to ensure that the settling defendants do not remain derivatively exposed to claims by these plaintiffs in the form of claims for indemnity or contribution by the nonsettling defendants against whom the plaintiffs may obtain judgments. The precise methods of judgment reduction to be employed are left to a time when, if ever, judgments against particular nonsettling defendants are obtained. Deferring these issues avoids the enormous complexities of hypothesizing findings of fact and law regarding future litigation against nonsettling defendants.
 
 
 19
 Once final approval by the district court is achieved and appellate review has run its course, more than $29 million (less a reserve for administrative purposes) will be distributed to those class members included within the First Tier. Only then can the remainder of the Boesky Fund be disbursed. Also, pending final approval of the settlements, discussions between Class VI members, individual Pacific Lumber plaintiffs, and the SEC over the status of all claims growing out of the takeover of Pacific Lumber are in abeyance. Presently, there exist differences, both as to theory of recovery and identity of relevant defendants, between the Pacific Lumber claims covered by the settlement stipulations and other Pacific Lumber claims in the coordinated action, SEC v. Drexel (Milken), 88 Civ. 6209 (MP) (S.D.N.Y.). Recovery from the Boesky Fund by the Objectors and other sellers of Pacific Lumber stock depends upon successful resolution of differences between the Class VI plaintiffs and the SEC as to the proper basis for recovery. The Pacific Lumber sellers argue that defendants' allegedly wrongful conduct caused them to sell their shares at a price lower than their true value. The SEC argues that the tender-offer price was increased by reason of the alleged wrongful conduct.
 
 
 20
 At present, therefore, it has not been determined how much, if anything, will be paid to the Class VI claimants as a result of these settlements.
 
 6) Subsequent Proceedings
 
 21
 The settlement stipulations are dated February 8, 1990. Relying on the fact that the signed stipulations were binding on all named plaintiffs, Boesky assisted in the effectuation of the SEC Plan of partial distribution for release of funds necessary to implement the settlement reached in the stipulations. He also began to provide Lead/Liaison Counsel with information useful in future litigation.
 
 
 22
 As noted, the structure of the settlements emerging in the ongoing negotiations was described by Lead/Liaison Counsel in meetings with plaintiffs' attorneys, including the Gold firm, on June 15, 1989 and November 29, 1989. The descriptions included the judgment-reduction provisions. Written drafts of the settlement stipulations were distributed and discussed in detail by Lead/Liaison Counsel and other plaintiffs' counsel, including the Gold firm, at the April 17, 1990 meeting. No Gold firm representative voiced an objection to the judgment-reduction provisions at any meeting.
 
 
 23
 On January 23, 1991, on the very eve of the district court's submission of the settlements to the class, nineteen months after the pertinent contents of the stipulations were first discussed in the presence of a representative of the Gold firm, and nine months after written drafts were given to the Gold firm, David Gold voiced an objection to the settlement stipulations by letter to Lead/Liaison Counsel. He first asserted that the settlements were negotiated and executed without the knowledge and authority of the firm or the Objectors. He also claimed that the settlements were substantively unfair because of the judgment-reduction provisions. Ensuing discussions between the Gold firm and Lead/Liaison Counsel proved fruitless. The Gold firm then communicated its objections to Judge Pollack.
 
 
 24
 The Objectors, although the Class VI representatives, are only four of the 187 Pacific Lumber claimants. No other Pacific Lumber claimant has objected to the settlements. Moreover, of the 80,000 class members given notice of the proposed settlements, Fries, Lippitt, Tribolet, and Harris are the only objectors.
 
 
 25
 Judge Pollack granted preliminary approval of the three settlement stipulations on February 2, 1991, and established a mechanism for notice to class members of the terms of the proposed settlements, of their right to object to the proposed settlements, and of their right to opt out of the certified classes and subclasses. The district court also set March 26, 1991 as a date for a hearing to consider final approval of the settlement stipulations. The Objectors then filed a motion for an order requiring a determination, prior to preliminary approval of the settlements, that cross-claims for contribution and/or indemnification between defendants be barred ("bar order"). The Objectors also filed objections to the judgment-reduction provisions of the proposed settlements.
 
 
 26
 Thereafter, pursuant to Fed.R.Civ.P. 23(e), Judge Pollack approved the settlements. He found that the stipulations were negotiated and reached in adversary circumstances, adequately disclosed to all interested parties, and entered into by Lead/Liaison Counsel with explicit and implied authority. He found further that the terms of the settlement stipulations and notice thereof were fairly and adequately communicated to the classes and subclasses involved and that those terms were fair, reasonable, and adequate.
 
 
 27
 The court denied the Objectors' motion for a bar order, observing that no obligation to indemnify the settling defendants could diminish the consideration obtained through the present settlements. The court noted further that the settlement stipulations' judgment-reduction provisions were consistent with an earlier order of the court deeming all defendants' claims for indemnification and contribution as affirmatively pleaded and as concomitantly denied without prejudice, and postponing a decision on an appropriate allocation of liability until such time as a determination of the amount of liability was made. Judge Pollack then certified the stipulations as final judgments, pursuant to Rule 54(b).
 
 DISCUSSION
 
 28
 On appeal, the Objectors challenge: (i) the authority of Lead/Liaison Counsel to negotiate and enter into the settlement stipulations, and (ii) the fairness of the settlements themselves.
 
 1) Authority of Lead/Liaison Counsel
 
 29
 The Objectors claim that Lead/Liaison Counsel had no authority to negotiate and settle their claims. Because the parties have argued the "authority issue" at a level of abstraction that obscures the precise rights at stake, some unpacking of this claim is necessary to discuss and resolve it. Two issues seem to be involved. The first is whether Lead/Liaison Counsel had the authority to negotiate settlements on behalf of all classes and to propose those settlements to Judge Pollack for further proceedings under Fed.R.Civ.P. 23(e). The second is whether, assuming that Lead/Liaison Counsel had such power, Lead/Liaison Counsel also had the authority, absent express consent, to sign the settlement stipulations on behalf of the Objectors as individual named plaintiffs, and, if so, whether the Objectors are barred from objecting to the settlements. We address these issues seriatim.
 
 
 30
 a) Authority to Negotiate and Propose a Settlement
 
 
 31
 This portion of the authority issue is entirely a red herring. So long as the district court ensures that the interests of all members of the class are adequately taken into account during negotiations, the authority of Lead/Liaison Counsel to negotiate and propose a settlement is largely what the district court says it is.
 
 
 32
 In complex litigation such as MDL 732, appointment of liaison counsel may be necessary to facilitate communication among the parties--among all the plaintiffs (or defendants), and between plaintiffs and defendants--and between the parties and the court itself. Duties of liaison counsel may include receiving and distributing documents on behalf of the represented group, convening meetings, giving notice of and reporting on developments in the case, maintaining a document depository, and other administrative functions. For reasons of convenience, where, as here, a multitude of actions are consolidated in a single court, an attorney in the transferee forum will often become liaison counsel. MCL 2d §§ 20.221, 41.31.
 
 
 33
 The appointment of a lead counsel may also be necessary. "The designation of lead or general counsel with broad powers to control the consolidated proceedings is common in related actions involving securities law violations." 2 Herbert B. Newberg, Class Actions p 9.30 (2d ed. 1985). The Manual for Complex Litigation summarizes the responsibilities of Lead Counsel as follows:
 
 
 34
 Lead counsel ordinarily have major responsibility for formulating and presenting positions on substantive and procedural issues during the litigation. Typically they act for the group--either personally or by coordinating the efforts of others--in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing plans for conduct of the litigation, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met.
 
 
 35
 MCL 2d § 20.221. Judge Pollack understandably saw fit to combine the functions of liaison and lead counsel in the instant matter.
 
 
 36
 The Manual notes that lead counsel are likely to be in the best position to conduct settlement discussions for the class, while underscoring the fact that when matters critical to the litigation are on the line, lead counsel must, where possible, attempt to work through consensus. MCL 2d § 20.222. We approve of the appointment of lead counsel for purposes of exploring and negotiating settlements in complex matters such as this. Compelling defendants to negotiate with a single negotiator authorized to speak for all the classes eliminates opportunities for divisive settlement shopping and promotes fair and comprehensive resolutions. It also diminishes the costs that multilateral bargaining would impose upon each class. See MacAlister v. Guterma, 263 F.2d 65, 68-69 (2d Cir.1958) (noting successful history in the New York courts of the use of lead counsel in consolidated litigation, and its efficiencies for avoiding delay, overlap, and duplication of effort).
 
 
 37
 Of course, authority to negotiate for all classes carries with it responsibilities. Lead counsel is expected in the ordinary course to keep other counsel for subclasses or members of the classes informed about negotiations and to consult with them regarding appropriate settlement terms. These duties flow naturally from lead counsel's broad authority, the nature of the negotiation of class action settlements, and the requirements of Rule 23(e). A failure to fulfill these duties may thwart approval of the settlement by the district court or reaching a settlement itself. First, the failure to communicate and consult with other plaintiffs' counsel is grounds for rejection of the settlement under Rule 23. See In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1124-33 (7th Cir.), cert. denied, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). Indeed, we believe that it would even be grounds for the district court to decline to give notice to the classes of the settlement under Rule 23(e) and to order further negotiations. Second, widespread dissatisfaction with the terms of the settlement among the classes and subclasses, which might well result from a lack of communication and consultation, will obviously increase the chance that the district court will reject it under Rule 23(e). Third, the willingness of defendants to settle may depend upon lead counsel's ability to dissuade members of the classes from objecting to the settlement or opting out. Fourth, and most important, a failure to communicate and consult may result in a settlement that is unfair to some members of the classes.
 
 
 38
 The fulfillment of lead counsel's responsibilities will normally result in the district court's submission to the classes of a proposed settlement pursuant to Rule 23(e). The authority of lead counsel to propose a settlement thus largely depends upon the district court's view of whether lead counsel has been vested with the responsibility to negotiate and has fulfilled the described responsibilities. We are most disinclined to cabin the authority of lead counsel by requiring the explicit agreement of every lawyer for a named plaintiff or subclass to the proposed settlement. To empower each representative of a named plaintiff or subclass to veto the very proposal of a settlement to the district court would generally not serve the purposes of Rule 23.[1] Such a power would encourage strategic behavior by representatives of named plaintiffs or classes, designed to maximize the value of the veto rather than the settlement value of their claims.
 
 
 39
 Turning to the instant matter, Lead/Liaison Counsel clearly had authority to negotiate with the defendants while informing and receiving feedback from attorneys for subclasses or individual members of the classes. As Judge Pollack stated when faced with the Objectors' challenge, Lead/Liaison Counsel had authority to present to the district court a proposed settlement, which the court in its discretion could thereafter propose to the classes. Judge Pollack stated that:
 
 
 40
 What they are doing is presenting a settlement. You have an objection to a feature of it. I have listened to [Mr. Gold], I know what your objection is, but don't try to cast this into the position of their authority, because they were authorized to do what was appropriate and reasonable for the class, nor did they preempt the judgment of the Court as to what the Court will decide on this matter.
 
 Thereafter, Judge Pollack found that:
 
 41
 [T]he proposed settlements were reached and fully negotiated in adversary circumstances, adequately disclosed to all participants and interested parties, maturely considered, and entered into by lead and liaison counsel with explicit and implied authority, in good faith and in the exercise of independent judgment.
 
 
 42
 Because, as noted, the authority of lead counsel to propose to the district court a settlement negotiated with the defendants is largely what the district court says it is, Lead/Liaison Counsel had such authority in the present case.
 
 
 43
 b) Authority to Sign the Settlement Stipulations on Behalf of the Objectors
 
 
 44
 The stipulations were purportedly executed by Lead/Liaison Counsel on behalf of all named plaintiffs, including the Objectors. The second aspect of the authority issue concerns the power of Lead/Liaison Counsel to sign on behalf of the Objectors as individual named plaintiffs. If the Gold firm's conduct at the various meetings of plaintiffs' counsel amounted to an agreement to the stipulations, then Lead/Liaison Counsel had authority to sign on behalf of the Objectors. However, the Objectors had the right to decline to agree. If the Gold firm's conduct did not amount to an agreement, Lead/Liaison Counsel still had the power to negotiate, sign, and propose the settlements to the district court, but not on behalf of the Objectors. Whether the Gold firm's conduct amounted to an agreement to the settlements is disputed by the parties.
 
 
 45
 We address this issue because whether Lead/Liaison Counsel had authority to sign on behalf of the Objectors may have legal consequences. First, although no caselaw appears to address the matter, a named plaintiff who is a party to a proposed class settlement may lose whatever opt-out rights are available; a named plaintiff who declines to become a party to such a settlement may retain such rights. Second, a named plaintiff who is a party to a proposed class settlement may lose the right to object to the substantive terms of the settlement before the district court; a named plaintiff who declines to become a party to such a settlement may object. See Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615 (9th Cir.1982), cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). Third, the defendants or other settling named plaintiffs may claim that a settlement that failed to deprive all named plaintiffs of these rights, while purportedly doing so, was no longer binding on them.
 
 
 46
 The first and third problems need not detain us. The Objectors have not attempted to opt out, and no party seeks relief from the settlement stipulations. What remains, therefore, is the issue of whether the Objectors have the right to challenge the fairness of the settlements. Judge Pollack addressed the issue only obliquely before entertaining and rejecting the challenge on the merits. Whether we enjoy the luxury of going directly to the merits is less clear.
 
 
 47
 Judge Pollack had subject-matter jurisdiction and the power to address the fairness of the settlements sua sponte. He therefore had little reason to pause to consider the Objectors' rights to raise the fairness issue. If they have contracted away that right, however, their lack of power might be viewed as a lack of standing. In turn, if the Objectors have no standing to challenge the settlements, they may also lack the power to appeal from a sua sponte ruling by the district court, and we may lack appellate jurisdiction over the merits of whether the settlements are fair. We of course would have appellate jurisdiction over whether the Objectors agreed to the settlements, but, lacking explicit findings by the district court on this issue, we might have to remand. However, given our view of events in the district court, we do not pause to consider the arguments pro and con regarding our jurisdiction.
 
 
 48
 Certainly, Judge Pollack might have viewed the Objectors as parties to the settlement stipulations and contractually barred them from challenging the settlements' fairness. Although the Gold firm continues to assert its pre-eleventh hour ignorance of the judgment-reduction provisions, this claim draws strength more from the vigor of its assertion than from the record of events. The Gold firm had verbal notice of the challenged provisions nineteen months before any objection was raised. The provisions were given to the Gold firm in written form some nine months before it registered an objection.
 
 
 49
 Although there is no record of an express agreement by the Objectors regarding the settlement stipulations, their knowledge and extended silence might easily support a finding of implied consent or estoppel. Given the context of meetings held for the purpose of informing and discussing settlement terms with a view to reaching a consensus, extended silence might be viewed as agreement. Certainly, the extensive consultation among Lead/Liaison Counsel and counsel for subclasses and individual members without objection to the judgment-reduction provisions left the unmistakable impression that a consensus including the Objectors had been reached. There is also evidence of reliance upon this consensus. Representatives of other members of the classes may well have viewed the settlements more favorably because of the apparent consensus, which would have led to quick distributions from the Boesky Fund and the expeditious pursuit of further proceedings against the nonsettling defendants. The eleventh-hour objections by the Gold firm and this appeal have substantially thwarted these expectations. Moreover, Boesky relied upon the terms of the signed stipulations in cooperating in the release of monies from the Boesky Fund and in providing Lead/Liaison Counsel with information.
 
 
 50
 Although Judge Pollack noted that Lead/Liaison Counsel had "explicit and implied authority" and that the negotiations and stipulations were disclosed "to all participants," his remarks concerning the fairness of the settlements expressly indicated that he was considering the objections stated by Mr. Gold because Gold had raised them. These remarks imply that Judge Pollack was not addressing the merits sua sponte but had decided to allow the Objectors to voice their objections. In doing so, Judge Pollack was simply responding to the practicalities of the circumstances before him. It was his duty to evaluate the settlements, a responsibility that may well have cautioned in the direction of listening to all comers regardless of a seeming contractual bar. Moreover, as long as the settling defendants or class members did not seek to be relieved of the settlements, the delay involved in litigating and appealing the authority issue, with the danger of a remand and second appeal, was potentially as great as, or greater than, hearing the Objectors on the merits. It was thus in the interest of all classes to follow a procedure that allowed the merits of the objections to be addressed. We believe, therefore, that we may permissibly view Judge Pollack's addressing of the merits as a discretionary ruling relieving Objectors of any contractual bar to objecting posed by the settlement stipulations.
 
 
 51
 We do not mean by this ruling to recommend to named plaintiffs in other class actions that they mimic the conduct of the Gold firm. Given the length of time that passed from the Gold firm's being informed of the judgment-reduction provisions and its objection to them, an inference of either negligent representation (grounds, perhaps, for Judge Pollack's granting of a discretionary extension of time to object) or a deliberate strategy of tactical disruption and delay seems inexorable. The result has been that Objectors, constituting about two percent of their own class and an infinitisimal fraction of the classes as a whole, and pursuing weak claims, have injured all classes by this appeal. Counsel contemplating similar actions in the future should be aware of Rule 11.[2]
 
 
 52
 2) The Fairness of the Settlement Agreements
 
 
 53
 A district court's approval of the settlement of a class action is reviewable under an abuse-of-discretion standard. See In re Chicken Antitrust Litigation American Poultry, 669 F.2d 228, 238 (5th Cir. Unit B 1982); see also Handschu v. Special Servs. Div., 787 F.2d 828, 833 (2d Cir.1986) (court-approved settlement based on well-reasoned conclusions arrived at after consideration of all relevant factors should be upheld on review).
 
 
 54
 The district court did not abuse its discretion in approving the settlement stipulations as fair, reasonable, and adequate. Judge Pollack found:
 
 
 55
 [T]hat the proposed settlements were reached and fully negotiated in adversary circumstances, adequately disclosed to all participants and interested parties, maturely considered, and entered into by lead and liaison counsel with explicit and implied authority, in good faith and in the exercise of independent judgment. The provisions of the settlements and notice thereof to the classes and subclasses and parties interested were fairly and adequately conveyed to the classes and subclasses involved and to those who received the approximately 80,000 copies of the notice, and represent fair, reasonable and adequate resolutions before trial of any issue and before liability has in any wise been conceded or established.
 
 
 56
 . . . . .
 
 
 57
 The settlements proposed and the proceeds thereon fully comply with the standards of Rule 23 of the Federal Rules of Civil Procedure and the Manual for Complex Litigation.
 
 
 58
 We perceive two interrelated issues. The first is whether such settlements may contain any provision whatsoever for the indemnification by plaintiffs of settling defendants for amounts owed to nonsettling defendants as a result of judgments secured against the latter by the plaintiffs. We believe they obviously can. The second is whether the method of judgment reduction must be determined at this time. We believe it obviously need not.
 
 
 59
 The Objectors argue that the settlements' judgment-reduction provisions create a possibility that any subsequent recovery from nonsettling defendants will be diminished--possibly significantly diminished. Depending on the judgment-reduction method selected, such a hypothetical possibility exists, but it does not render the settlement stipulations unfair or unreasonable. The judgment-reduction provisions were included in the agreement after difficult bargaining. The settling defendants' motive to compromise would have been severely diminished if they were compelled to remain derivatively liable for sums later paid to the plaintiffs by nonsettling defendants. Without the provisions in question, therefore, it is likely that no settlements could have been reached. Moreover, recovery against nonsettling defendants is at this stage speculative, and the prospect of serious reduction in such a judgment is doubly speculative. This is particularly the case with regard to the members of Class VI, given the open question of whether they suffered a loss rather than made a profit in the pertinent transaction.
 
 
 60
 Against the somewhat remote possibility of such a dimunition must be weighed the fact that the settlements will lead to a distribution of funds to many members of the classes that cannot be diminished by whatever judgment-reduction method is used. Moreover, the settlements conferred "valid claim" status on Class VI plaintiffs for purposes of recovery from the Boesky Fund. These are concrete benefits that could not likely have been obtained without the judgment-reduction provisions.
 
 
 61
 We also agree with Judge Pollack that a resolution of issues concerning the methods of judgment reduction against nonsettling defendants may reasonably be deferred. As he noted, to address those issues now would have required the making of "hypothetical findings of law or fact on judgments not yet obtained against nonsettling parties not now before the Court as to claims for contribution or indemnification which they might assert in determination of the liability not yet established." Claims by nonsettling defendants for contribution or indemnification may raise issues as to the legal basis for the particular judgment and the precise facts found. Moreover, choice-of-law questions may preclude use of a single judgment-reduction method for each nonsettling defendant. Other complexities may arise that are not evident at this time and on this record. We note, moreover, that neither the settling nor the nonsettling defendants object to these matters being deferred. For similar reasons, the denial of the motion for a bar order was correct.
 
 
 62
 We do not mean to suggest that a settlement may not contain a provision designating a particular judgment-reduction method or an order barring subsequent cross-claims by nonsettling defendants against settling defendants. See In re Jiffy Lube Securities Litigation, 927 F.2d 155 (4th Cir.1991). However, such provisions are more practical where the settling defendants regard them as desirable or necessary, where the number of nonsettling defendants is small, and where a single set of facts is involved. Id. None of those luxuries are present in the instant matter.[3]
 
 CONCLUSION
 
 63
 Lead/Liaison Counsel had authority to propose the settlements to the district court. There was no abuse of discretion in Judge Pollack's finding that the settlement stipulations were fair, adequate and reasonable. Accordingly, the district court's orders approving the settlement stipulations and denying Objectors' motion for a bar order are affirmed. Given the frivolousness of this appeal and the needless delay it has caused, the mandate shall issue forthwith.
 
 
 
 [1]
 We do not suggest that a district court lacks power to lodge such a veto power in representatives of subclasses where the circumstances suggest to the court the appropriateness of such an order, at least for a limited period of time
 
 
 [2]
 We believe that whether the Gold firm should be sanctioned sua sponte is best addressed first by the district court
 
 
 [3]
 The Objectors' argument that the form of notice alerting class members to the settlements was inadequate is entirely without merit