995 F.2d 1138
 Fed. Sec. L. Rep. P 97,457
In re The DREXEL BURNHAM LAMBERT GROUP INC.; In re: Drexel
Burnham Lambert Trading Corporation; In re: Drexel Burnham
Lambert Trade Finance, Inc.; In re: Drexel Burnham Lambert
Incorporated; In re: BRR Incorporated; In re: Deauville
United Corporation; In re: Double Oil & Gas Incorporated;
In re: Drexel Burnham Lambert (Asia) Ltd.; In re: Drexel
Burnham Lambert C.P. Inc.; In re: Drexel Burnham Lambert
Capital Group, Inc.; In re: Drexel Burnham Lambert Caribe
International Incorporated; In re: Drexel Burnham Lambert
Commercial Paper Incorporated; In re: Drexel Burnham
Lambert International Inc.; In re: Drexel Burnham Lambert
Investors Corp.; In re: Drexel Burnham Lambert MBI Corp.;
In re: Drexel Burnham Lambert Products Corp.; In re:
Drexel Investment Holdings Inc.; In re: Drexel Burnham
Lambert Government Securities Inc.; In re: Drexel Burnham
Lambert Realty Corp.; In re: First DBL Corporation, Debtors.
The DREXEL BURNHAM LAMBERT GROUP, INC.; Drexel Burnham
Lambert Incorporated, Debtors-Appellees,
v.
CLAIMANTS IDENTIFIED ON SCHEDULE 1; Pool Administrators
Identified on Schedule 3; Settling Participants
Identified on Schedule 2, Claimants-Appellees,
Hart Holding Company, Inc.; Reeves Industries, Inc.;
Gemini Overseas Corporation; Commercial Union Assurance Co.
PLC; Commercial Union Pensions Management, Ltd.; Overbrook
Nominees, Ltd.; Strand Nominees, Ltd., Claimants-Appellants.
 Nos. 317-319, Docket 92-5032, 92-5034, 92-5036.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 15, 1993.
Decided May 26, 1993.
 
 George D. Reycraft, New York City (Debra Brown Steinberg, Cadwalader, Wickersham & Taft, New York City, of counsel), for appellants Gemini Overseas Corp.; Commercial Union Assur. Co. PLC; Commercial Union Pensions Management, Ltd.; Overbrook Nominees, Ltd.; Strand Nominees, Ltd.
 Richard J. Davis, New York City (Deborah Deitsch-Perez, Weil, Gotshal & Manges, Rory O. Millson, Joanne M. Gentile, Cravath, Swaine & Moore, Melvyn I. Weiss, Milberg Weiss Bershad Specthrie & Lerach, New York City, of counsel), for appellees Drexel Burnham Lambert Group, Inc.; Drexel Burnham Lambert Inc.; Pool Administrators.
 Stanley Nemser, New York City (Wolf Popper Ross Wolf & Jones, New York City, David Berger, Berger & Montague, P.C., Philadelphia, PA, of counsel), for Subclass B representative-appellees.
 (Mark Parry, Alan E. Gamza, Moses & Singer, New York City, Whitton E. Norris, III, William W. Kannel, Michael R. Balfe, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, of counsel), filed a brief for appellants Hart Holding Co., Inc.; Reeves Industries, Inc.
 (Daniel R. Murdock, James L. Stengel, Alan B. Howard, Donovan Leisure Newton & Irvine, New York City, Theodore N. Miller, Sidley & Austin, Chicago, IL, of counsel), filed a brief for appellees Guildford Capital and Raleigh Investment Management.
 Before MESKILL, Chief Judge, CARDAMONE and McLAUGHLIN, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal concerns a $1.3 billion global settlement of civil claims that arose as a result of Michael Milken's illicit activities as head of Drexel Burnham Lambert Group's High Yield and Convertible Bond Department. Milken, who pioneered the use of low-grade, high-yield junk bonds to finance takeovers and leveraged buyouts while serving as head of Drexel's junk bond group, had his office in Beverly Hills, California, far removed from and independent of Drexel's New York City headquarters. He became the leading disciple of the theory that sheer greed is what drives our national securities markets, and along the way created an enormous cash cow that yielded him monopoly profits in the hundreds of millions of dollars--$500 million, reportedly, in a single year.
 
 
 2
 The violations of the securities laws that led to Milken's meteoric rise to fame and his inevitable downfall are not the subject of this writing, although the settlement resulting from that fall is the subject of this appeal. Suffice it to say that while acting as a market professional Milken sought to exclude competition from the high-yield junk bond market and as a result of his control over entry to that market extracted monopoly profits from it illegally. Geographically removed from governance by the Drexel firm, and acting as principal, not as an agent, Milken fed securities into investment partnerships he controlled (not telling the issuers or sponsors) thereby earning vastly greater returns than he would have earned were he acting simply as an investment banker. In this display of avarice, Milken plainly thought of money and of his own gain first, leaving integrity and his clients' interests a distant second. Such conduct contravened the fundamental notion that public securities markets are governed by principles of "fair and honest" dealing and should be "free and open" to competition. The proof of Milken's guilt was strong enough to force him to plead guilty in April 1990 to six serious felony charges including conspiracy to violate federal securities laws, securities fraud, mail fraud, and filing false tax returns. In conjunction with his guilty plea Milken agreed to pay a $200 million criminal fine and to establish a $400 million civil restitution fund with the Securities and Exchange Commission (SEC).
 
 
 3
 The global settlement before us involves hundreds of private parties, including Milken's former employer, the now bankrupt Drexel Burnham Lambert. In an order entered March 10, 1992, Senior Judge Milton Pollack of the United States District Court for the Southern District of New York approved Drexel's participation in this agreement and certified Milken's entitlement to a release from any further liability to those who participated in the settlement. Gemini Overseas Corp., Commercial Union Assurance Co., Plc., and three limited partnerships (collectively, Gemini Group or appellants) contend the district court's order approving the settlement was issued without proper notice or a hearing, violates the terms of the $400 million SEC restitution fund and the final judgment embodying it, and represents an abuse of the court's discretion.
 
 FACTS
 A. Drexel Burnham Bankruptcy
 
 4
 The events surrounding Michael Milken and his employer Drexel Burnham are well-documented, widely known, and need not be repeated in detail. We recount only those facts essential to understanding the instant appeal.
 
 
 5
 In February 1990 Drexel Burnham filed a voluntary petition for Chapter 11 bankruptcy relief. Over 15,000 parties immediately filed claims against the estate, some 850 of which arose out of Drexel Burnham's actions in buying, selling, and underwriting securities. To encourage settlement of these claims the district court withdrew them from the bankruptcy court's jurisdiction pursuant to 28 U.S.C. § 157(d). In March 1991, after months of round-the-clock negotiations, the securities claimants reached a complex agreement with Drexel Burnham known as the Securities Litigation Claims Settlement Agreement (Drexel Burnham-SLC Agreement), which we approved in In re Drexel Burnham Lambert Group, Inc. (Drexel I), 960 F.2d 285, 293 (2d Cir.1992), cert. dismissed, --- U.S. ----, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993). Its provisions were incorporated in Drexel Burnham's bankruptcy reorganization plan.
 
 
 6
 For purposes of later discussion we mention two central elements of the Agreement: the so-called Pooling Arrangement and the Injunction-Release provisions. The Pooling Arrangement required that Drexel Burnham and a sub-class of its securities claimants "pool" their recovery from lawsuits brought by Drexel Burnham against its former directors and officers. See id. at 288-89. Among claims subject to such pooling were causes of action against Michael Milken and certain related parties. The Federal Deposit Insurance Company (FDIC), the Resolution Trust Company (RTC), and a law firm representing Drexel Burnham shareholders were named Pool Administrators, with responsibility for deciding how best to pursue or settle these claims. Drexel Burnham and the Pool Administrators are the appellees on this appeal.
 
 
 7
 The Injunction-Release provision stated that individuals settling with the Pool Administrators would be released from liability to all parties to the Drexel Burnham-SLC Agreement. Persons and entities benefiting from this release are referred to as Identified Settling Parties. This provision, which covers claims brought after May 3, 1991, was found in Drexel I to be "a key component" of the Drexel Burnham-SLC Agreement because it allows directors and officers to settle suits with Pool Administrators "without fear that future suits will be filed" by other Drexel Burnham-SLC parties. Id. at 293.
 
 B. SEC Disgorgement Fund
 
 8
 On April 24, 1990 Milken plead guilty, as noted, to the six-count information and was sentenced to a ten-year prison term. At the same time he settled a civil action brought against him by the SEC. Under the terms of his plea and settlement, he agreed, as earlier stated, to pay a $200 million criminal fine and to establish a $400 million civil claim fund that was called the SEC Disgorgement Fund.
 
 
 9
 This Disgorgement Fund was set up to compensate private parties with claims against Milken arising out of his illicit activities at Drexel. The assets of the fund, minus certain administrative expenses, are to be distributed pursuant to a plan or plans proposed by the SEC and approved by the district court, or to parties making "valid claims" against Milken. Milken may make application to the court for payment of such valid claims, which are defined in the judgment establishing the Disgorgement Fund as claims arising out of a) bona fide final judgments against Milken; b) bona fide court approved settlements with Milken; and c) agreements reached in good faith to settle "any bona fide claim for compensatory damages ... arising out of Drexel-related Activities." Milken retains the right to pay out these valid claims "in connection with a joint settlement with Drexel."
 
 
 10
 The establishment of the SEC Disgorgement Fund was not intended to limit Milken's liability to injured persons, and distributions from the fund are not conditioned on the claimants' release of Milken from liability. To this end, the final judgment of the district court approving the fund states: "Except as explicitly provided in this FINAL JUDGMENT and the CONSENT, nothing herein is intended to or shall be construed to have created, compromised, settled, or adjudicated any claims ... or rights ... other than as between the [SEC] and MICHAEL MILKEN and his immediate family."
 
 C. Appellants' Claims Against Milken
 
 11
 Appellants are participants in a civil fraud action styled Arden Way Assocs. v. Boesky, originally brought in the Southern District of New York in March 1987 and subsequently consolidated with other pending actions. Appellants alleged in the Arden Way action that they were fraudulently induced by Ivan Boesky, in conjunction with Michael Milken, Drexel Burnham and others, to purchase partnership interests in an Ivan Boesky-run arbitrage fund. They contend the unlawful securities arrangements involving Milken that are at the core of the Arden Way case were the subject of the criminal information to which Milken plead guilty. Hence, Gemini Group believes it is a member of the class of persons "entitled" to participate in the distribution of the $400 million SEC Disgorgement Fund.
 
 D. Milken Global Settlement
 
 12
 Pursuant to the authority vested in them by the Drexel Burnham-SLC Agreement, the Pool Administrators attempted to settle their $1 billion in claims against Milken, 200 other former employees of Drexel Burnham's junk bond department, and some 350 affiliated entities. The Administrators recognized that an equitable settlement was in the best interest of all the parties to the Drexel Burnham-SLC Agreement because, absent settlement, they would be locked into years of costly litigation with Milken and his colleagues and believed any eventual recoveries would likely be hindered by numerous individual bankruptcies. Thus, the Pool Administrators joined non-signatories to the Drexel Burnham-SLC Agreement for five months of negotiations with Milken and his associates, all of which were closely monitored by the district court.
 
 
 13
 In February 1992 the parties reached a tentative agreement known as the Milken Global Settlement to resolve about 180 pending Drexel Burnham-related lawsuits against Milken, his former colleagues in the Drexel junk bond department, and related entities. The principal terms of this settlement include: a) payment of $1.3 billion by Milken and his colleagues on a prescribed schedule to the settlement participants; b) designation of Milken and his compatriots as Identified Settling Parties under the Injunction-Release provision of the Drexel Burnham-SLC Agreement and the Drexel Burnham bankruptcy plan; c) release of over $300 million in claims against Drexel Burnham by Milken and the related parties; d) creation of a $50 million fund to deal with any claims not covered by the Global Settlement, including those of claimants who elect not to participate in the Global Settlement; and e) election by plaintiffs in pending cases against Milken and the other settling parties whether or not to opt into the Global Settlement. The $1.3 billion to be paid to the settlement participants comes from the following sources: $400 million from the SEC Disgorgement Fund, under a plan of distribution to be presented by the SEC and approved by the district court; $500 million paid directly by Milken; $300 million from other Drexel Burnham employees and related entities; and $100 million from various insurers that issued policies to Drexel Burnham.
 
 E. District Court Order
 
 14
 On February 14, 1992 appellees, Drexel Burnham and the Pool Administrators, jointly moved to have the district court approve their participation in this Global Settlement pursuant to Fed.R.Bankr.P. 9019 and to designate Milken and the related parties as Identified Settling Parties. The district court directed that a hearing be held to consider this motion and ordered that notice be sent--in accordance with Fed.R.Bank.P. 2002--to 7,700 Drexel bankruptcy claimants by first class mail on or before February 15, 1992.
 
 
 15
 The notice informed claimants of the hearing to be held on March 6, 1992 and included a brief outline of the proposed principal terms of the Global Settlement. The notice then revealed, inter alia, that the $400 million SEC Disgorgement Fund would be allocated to the $1.3 billion Global Settlement pool, and that Milken and others would be named Identified Settling Parties to be indemnified from further liability under the Injunction-Release provision. Appellants acknowledge receipt of this notice.
 
 
 16
 To accommodate last-minute negotiations between Milken and the FDIC, the district court delayed the hearing scheduled for Friday, March 6 until Monday, March 9, 1992. On that date the district court entertained objections to the Milken Global Settlement, and parties opposed to the settlement, including appellants, were permitted to speak. In an order dated the same day, the district court approved both the participation of Drexel Burnham in the Global Settlement and the designation of Milken and the related parties as Identified Settling Parties. In doing so, it held the Global Settlement was "fair and reasonable" and "in the best interests of the [Drexel] Debtors' estates, creditors, and shareholders." Judge Pollack reached this conclusion by considering
 
 
 17
 the probability of success in litigation of the Drexel Debtors' claims against the Settling Participants in comparison to the benefits offered by the Global Settlement, the fact that the Settling Participants have rigorously denied all liability, the critical role that various providers of Directors and Officers Liability Insurance are playing in making the Global Settlement possible, the prospect of complex and protracted litigation if the Global Settlement is not approved, the degree to which the settlement is supported by the parties in interest, the competency and experience of counsel who support the settlement, and the relative benefits to be received by the Debtors' estates and their creditors.
 
 
 18
 Appellants seek review of this order. We affirm.
 
 ANALYSIS
 I Procedural Deficiencies
 
 19
 Gemini Group asserts initially that its rights to receive fair notice and an opportunity to be heard were abridged by the recited proceedings to such an extent that they infringed the Group's constitutionally protected due process interests, thereby rendering the March 9, 1992 order void.
 
 A. Notice
 
 20
 What process is due under the Due Process Clause when asked in the abstract is an imponderable question like "What is Truth?" John 18:38. When focused on concrete circumstances or particular parties, it still admits of no easy answer, but then it is at least agreed that no person may be deprived of life, liberty or property by an adjudicatory process without first being afforded notice and a full opportunity to appear and be heard, appropriate to the nature of a given case. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). No rigid constitutionally mandated standard governs the contents of notice in a case like the one before us. Rather, the Due Process Clause requires the best notice practical under the circumstances, id. at 315, 70 S.Ct. at 657, and the Supreme Court has warned against interpreting this notice requirement so inflexibly as to make it an "impractical or impossible obstacle[ ]." Id. at 314, 70 S.Ct. at 657; cf. Grannis v. Ordean, 234 U.S. 385, 395, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914) (The Due Process Clause "does not impose an unattainable standard of accuracy.").
 
 
 21
 Under this standard notice is adequate so long as it is reasonably calculated to apprise the parties of the terms of a proposed settlement and the options available in connection with the judicial proceeding. See Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir.1982) (Friendly, J.), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). The procedures the district court provided in the instant case fulfill these requirements. Its three-page notice dated February 14, 1992 informed the 7,700 claimants in the Drexel Burnham bankruptcy of the proposed March 6 hearing to consider the joint motion of Drexel Burnham and the Pool Administrators. It also disclosed that the SEC Disgorgement Fund's "$400 million is to be made available" to persons participating in the settlement "under an SEC proposed and Court approved Plan of Distribution." The notice further declared that under the proposal Milken would be designated an Identified Settling Party
 
 
 22
 released from any and all claims, obligations, rights, causes of action and liabilities which [Drexel Burnham], the Pool Administrators and any holder of a Claim against or Equity Interest in the Debtors have asserted or may be entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, based in whole or in part upon any act or omission or other occurrence that has taken place on or prior to the Consummation Date of the Plan [of Drexel Burnham Bankruptcy Reorganization] in any way relating to the Debtors, the Chapter 11 Cases or the Plan....
 
 
 23
 Admittedly, this broadly worded notice did not include a detailed description of each item included in the proposed Milken Global Settlement. Such precise specificity apparently was impossible given that negotiations with respect to details of the settlement agreement were ongoing and not concluded until the proverbial eleventh hour, on the weekend of March 7. This lack of particularity does not constitute a constitutional deficiency. Notice may satisfy due process without setting forth verbatim the full text of a proposed settlement; it may describe the settlement in general terms. See Handschu v. Special Servs. Div., 787 F.2d 828, 833 (2d Cir.1986). Thus, the notice given by the district court did not contravene the Due Process Clause.
 
 B. Hearing
 
 24
 The Gemini Group next contends that the district court had already approved the Drexel and Pool Administrators' Joint Motion in advance of the March 9 hearing. Appellants believe the hearing held on that date was therefore a sham and that their constitutional right to be heard was given short shrift. See Mullane, 339 U.S. at 314, 70 S.Ct. at 657.
 
 
 25
 We think this view mischaracterizes the hearing. All interested parties were provided with an opportunity to make written and oral objections to the proposed settlement agreement. The trial court read all of the papers filed in objection to the joint motion and then made clear at the hearing that everyone had the opportunity to ask all the questions necessary to satisfy themselves as to where they stood with respect to the proposal. To further this aim, the district court considered all the objections raised, though it justifiably refused to allow minor quibbles to derail this expensive and intricate Global Settlement. Such procedure did not violate due process. Cf. MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 94 (2d Cir.) (rejecting a similar argument), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988).
 
 
 26
 That what transpired did not amount to a constitutionally inadequate pro forma hearing is made plain from the way the specific contentions of the Hart Holding Company and Reeves Industries--formerly parties to this appeal--were treated. Hart and Reeves argued that the Global Settlement opt-out provision was illusory in its case because if this settlement were approved Hart and Reeves would be denied a remedy it was seeking in a separate action in the Delaware courts. The district court admitted that it had not caught this detail, and believing this objection might have merit, instructed Hart and Reeves to present its claim fully to Milken's lawyers. It stated that if the objection were valid appropriate measures would be taken. It is evident from this example that the trial court did not summarily dismiss all the objections without deigning to consider them, as appellants would have us believe.
 
 
 27
 Appellants' other argument that the hearing procedure was inadequate due to the "secrecy" of the Milken Global Settlement negotiation process also misses the mark. At root, this contention appears to be that the Gemini Group was improperly excluded from the settlement negotiations, a point specifically addressed by us in Drexel I. There we stated that not all affected parties had a right to be at the negotiating table, because were such an unrealistic proposition to be implemented no settlement could ever have been achieved. Drexel I, 960 F.2d at 293; see also In re Ivan F. Boesky Sec. Litig., 948 F.2d 1358, 1365 (2d Cir.1991) (approving appointment of single counsel "for purposes of exploring and negotiating settlements in complex matters"). The settlement process--which, as noted, was closely monitored by the district court--allowed for representation and consideration of various competing views. To the extent that appellants continue to believe that their particular interests were not represented in this process they have the right to opt out of the Global Settlement and to pursue their own remedies. But we see nothing in the procedure followed that taints the March 9 hearing.
 
 
 28
 II Conflict With the SEC Disgorgement Fund: A Problem of
 
 Ripeness for Review
 
 29
 Gemini Group next declares that the Milken Global Settlement violates the terms of the SEC Disgorgement Fund and the district court judgment embodying it. Specifically, they believe that the Global Settlement calls for distribution of the $400 million Disgorgement Fund entirely to parties without "valid claims," as that term is defined in the SEC Disgorgement Fund consent agreement. The Pool Administrators respond that this issue is not "ripe" for review because the SEC has presented no formal plan of distribution for the $400 million fund. They contend that absent such a definite commitment on the part of the SEC to contribute the assets of the Disgorgement Fund to the Milken Global Settlement, there is simply no justiciable issue for us to resolve. We agree.
 
 
 30
 The basic rationale underlying the doctrine of ripeness "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements...." Abbott Lab. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Ripeness is thus "peculiarly a question of timing." Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580, 105 S.Ct. 3325, 3332, 87 L.Ed.2d 409 (1985) (quoting Regional Rail Reorganization Act Cases, 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974)). The doctrine turns on whether there are nebulous future events so contingent in nature that there is no certainty they will ever occur. See 13A Charles A. Wright et al., Federal Practice and Procedure § 3532, at 112 (2d ed. 1984). In inquiring whether a particular matter is ripe for examination we look, first, to the fitness of the issue for review and, second, to the hardship to the parties of withholding consideration, see Abbott Lab., 387 U.S. at 149, 87 S.Ct. at 1515, and resolve this two step inquiry pragmatically. Cf. Brown Shoe Co. v. United States, 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510 (1962) (discussing finality).
 
 
 31
 Examining this issue therefore in a practical light, we think appellants' objections to the contemplated distribution of the SEC Disgorgement Fund are premature. Although the SEC participated in at least some of the discussions regarding the Milken Global Settlement, it has not on this record indicated its approval of the agreement and has to date presented no plan of distribution for the $400 million Disgorgement Fund. Hence, the SEC retains substantial discretion in allocating the fund's assets, and may reject the distribution the parties to the Global Settlement intended for exactly the same substantive concerns the Gemini Group raises. Were we now to decide the issues appellants present we might inadvertently foreclose or undermine a decision properly made by the SEC. See Isaacs v. Bowen, 865 F.2d 468, 478 (2d Cir.1989).
 
 
 32
 More importantly, the district court has issued no order approving the distribution of the SEC Disgorgement Fund for us to review. Appellants' contention that the district court's March 9 order was final is inapposite. Finality of that order is not the issue before us; rather, the question is what was decided by the district court on March 9 that we may now review. It is clear that the March 9 order did not determine the actual distribution of the SEC Disgorgement Fund. It is up to the SEC to present a plan for distribution for that fund in the normal course, and the district court is then duty bound to examine such plan under its general equitable powers. See SEC v. Wang, 944 F.2d 80, 81 (2d Cir.1991). At that point, with the benefit of a complete record, appellate review may be undertaken. To do so in advance of these necessary steps would be premature.
 
 
 33
 Moreover, refusal to address this issue now does not impose an undue hardship on the appellants. Finalization of the Milken Global Settlement is expressly conditioned on court approval of the SEC plan of distribution for the $400 million Disgorgement Fund. Consequently, there is no danger the Global Settlement will be approved before the Gemini Group can present its objections.
 
 III Fairness to Third Parties
 
 34
 Appellants additionally contend the district court abused its discretion in issuing the March 9 order because it failed to give due consideration to the fairness of the Milken Global Settlement as it impacts on them and other non-settling third parties. They correctly state that before endorsing a settlement, the district court is obligated to make an examination of how the accord affects the rights of third parties. See In re Masters Mates & Pilots Pension Plan and IRAP Litig., 957 F.2d 1020, 1026 (2d Cir.1992). But they incorrectly believe the district court failed adequately to discharge this duty.
 
 
 35
 As already observed, anyone wishing to object to the Global Settlement was allowed to present their views and all objections were considered before the district court issued its March 9 order. The court found the settlement "fair, reasonable, and adequate," Weinberger, 698 F.2d at 73; accord Wang, 944 F.2d at 84, not only to the settling parties but also to objectors such as the Gemini Group. Appellants have pointed to no facts that persuade us that the district court decision constituted an abuse of its discretion.
 
 IV Sanctions
 
 36
 Appellees ask us to sanction the Gemini Group under Fed.R.App.P. 38 for bringing what they term a frivolous and premature appeal. Sanctions may be imposed when one party proceeds with an argument "totally lacking in merit, framed with no relevant supporting law, conclusory in nature, and utterly unsupported by the evidence." United States v. Potamkin Cadillac Corp., 689 F.2d 379, 381-82 (2d Cir.1982) (per curiam ). Sanctions of course are not imposed merely because one side does not prevail in a given case. Cf. Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22, 98 S.Ct. 694, 700-01, 54 L.Ed.2d 648 (1978) (warning against the use of "hindsight logic" that "because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation"). The standard for the imposition of such a penalty is where the appeal taken is found to be groundless, without foundation, and without merit, even though appellant did not bring it in bad faith. See id. at 421, 98 S.Ct. at 700. Appellees have not satisfied this standard. Hence, we decline their request to impose sanctions on appellants.
 
 CONCLUSION
 
 37
 Without expressing any view on the merits of Gemini Group's claim that the Global Settlement violates the terms of the Disgorgement Fund, we affirm the order of the district court.