INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE, AND FURNITURE WORKERS, AFL–CIO, and its Affiliated Locals 165, 445, 450, 470 and 792 and William Powell, Elizabeth Balzano, Emil Phil Martino, Peter F. Szczybek, John T. McDaniel, Charles Zalewski, Robert Kennedy and Alfred Eschwege, as individuals for and on behalf of those similarly situated, Plaintiffs,

v.

UNISYS CORPORATION and the Unisys Corporation Medical Plan, Defendants.

LOCAL UNIONS 3 AND 1667 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, and Agnes Rahuba and Stephen J. Roth, as individuals for and on behalf of those similarly situated, Plaintiffs,

v.

UNISYS CORPORATION and the Unisys Corporation Medical Plan, Defendants.

Nos. 92–CV–5719(JS), 93–CV–839(JS).

United States District Court, E.D. New York.

Aug. 3, 1994.

James G. Mauro, Jr., Washington, DC, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City by Everett E. Lewis and Nicholas F. Lewis, Counts & Kanne, Chartered, Washington, DC by David H. Potts–Dupre, for plaintiffs.

Morgan, Lewis & Bockius, New York City by George A. Stohner and Christopher A. Parlo, for defendants.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City by James Wasserman, for amicus curiae.

### *MEMORANDUM AND ORDER*

SEYBERT, District Judge:

The parties in the instant consolidated class action petition the Court for approval of a proposed settlement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. For the reasons discussed herein, the settlement is approved.

### *BACKGROUND*

A. *Overview Of The Claims Asserted, Class Certification, And Orders Leading Up To The Fairness Hearing*

This is a consolidated action consisting of two separate class actions brought against defendants Unisys Corporation and The Unisys Corporation Medical Plan [hereinafter referred to jointly as "Unisys"] under the Labor Management Relations Act ("LMRA"), the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the common law. The plaintiffs in these class actions assert claims on behalf of certain retirees of Unisys, and their surviving spouses and dependents who are eligible to receive retiree benefits [hereinafter referred to jointly as "the Conference Board retirees"]. The plaintiffs allege, *inter alia,* that Unisys breached certain collective bargaining agreements that it had entered into with the International Union of Electronic, Electrical, Salaried, Machine, and Furniture Workers, AFL–CIO ["IUE"] and the International Brotherhood of Electrical Workers, AFL–CIO ["IBEW"] by unilaterally changing the benefit coverage of the Conference Board retirees and their spouses and

dependents, effective January 1, 1993. As a result of these unilateral changes, the plaintiffs would be required to make additional contributions to ensure their continued receipt of specified medical benefits.

By Order dated March 11, 1994, the Court, pursuant to Rules 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure, conditionally certified the settlement class, defining it in terms of nine separate subclasses. By this same Order, the Court also conditionally certified the named plaintiffs as class representatives and their counsel as class counsel.

On April 8, 1994 the Court issued two separate orders in connection with the parties' efforts to settle this consolidated class action. First, the Court preliminarily approved a Stipulation of Settlement and Dismissal ("Stipulation of Settlement") for the instant consolidated class action subject to the provisions of an accompanying preliminary order.[1]

On this same date, the Court entered an "Order Regarding Proposed Settlement of Class Action and Notice to Class" (the "Preliminary Order.") The Preliminary Order contains several provisions. Among other things, the Preliminary Order (i) reaffirmed the appropriateness of the Settlement Class and the subclasses as set forth in the Court's earlier Order Conditionally Granting Class Certification dated March 11, 1994, (ii) preliminarily approved the terms and conditions of the Stipulation of Settlement entered into between the parties, (iii) determined that the proposed notices to class members submitted by the parties met the requirements of Fed. R.Civ.P. 23 and due process, (iv) scheduled a fairness hearing for June 3, 1994, (v) established procedures whereby any settlement class member could appear at the hearing or otherwise object to the settlement, and (vi) enjoined all members of the Settlement Class from prosecuting, either individually or in a representative capacity, any claim or cause of action against Unisys with respect to matters embraced within the scope of the complaints to the consolidated actions.

The Preliminary Order also approved a " 'Bar Notice' described in paragraphs 4 and 5 of the Stipulation [of Settlement], and attached to the Stipulation [of Settlement] as Exhibit C." Preliminary Order ¶ 5. In addition, the Preliminary Order authorized the Settling Defendants, by April 15, 1994, to cause the Bar Notice to be mailed to such persons as mutually agreed upon by the parties. *See id.* ¶ 6.

The Bar Notice served three distinct purposes. First, it informed the persons receiving it of the proposed settlement with Unisys Corporation. Second, it informed such persons of the establishment, pursuant to the Stipulation of Settlement, of two settlement trust accounts for the members of subclasses 7, 8 and 9. Last, it informed persons, who are neither parties to the action nor members of a settlement class, of the parties' intention to obtain a judgment that would extinguish their claims with respect to the establishment of the settlement trust accounts and the methods used to fund them. Further to this point, the Bar Notice conferred standing upon persons who are not represented in this action, subject to certain procedures, to object to the proposed settlement by appearance before the Court.

By Memorandum and Order dated May 17, 1994, the Court vacated its prior approval of the Bar Notice, finding that the same was part of an impermissible "greater design to obtain a binding final order and judgment that, as a matter of res judicata, would purport to extinguish the right of unrepresented persons to challenge the establishment of the settlement trust accounts and the methods used to fund them."[2] *International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers v. Unisys Corp.*, 155 F.R.D. 41, 47 (E.D.N.Y. May 17, 1994) [hereinafter "Memorandum and Order"]. By the same Memorandum and Order, the Court denied an application by James Wasserman, Esq. of the law firm of Vladeck, Waldman, Elias, & Engelhard, P.C. to file a motion to permit certain current and prospective Local 444 retirees to intervene in the instant consolidated action for purposes of moving to

---

1. The terms of the Stipulation of Settlement are discussed in detail in Part B *infra.*

2. In all other respects, the Court left its prior orders in this Action undisturbed.

vacate the Stipulation of Settlement.[3] Nevertheless, in view of his clients' adversity of interest to the settling parties which would heighten the Court's ability to monitor the scope of the forthcoming proposed final order and judgment, and permit a response to be filed to a then-pending motion by the defendants to certify additional subclasses of unrepresented persons without first joining them to the action by service of a complaint,[4] the Court conferred amicus curiae status upon Mr. Wasserman. The Court further instructed counsel for each of the parties to the instant consolidated action to serve a copy of all prospective correspondences to the Court upon Mr. Wasserman until such time that the Court directed otherwise. *See* Memorandum and Order, 155 F.R.D. at 49. Finally, the Court explicitly instructed counsel for each of the parties to this action that it would not approve any proposed final settlement that sought a final adjudication of rights with respect to persons who are unrepresented (i.e., non-class members) in the instant consolidated action. *See id.* at 48.

## B. *The Proposed Settlement*

The proposed settlement accords different rights to each of subclasses in exchange for the release of their claims. This variance in rights is due to the subclasses' independent chronologies, as each Unisys facility and local union generally had its own unique collective bargaining history and contract language. The medical benefits provided to retirees by Unisys and its predecessor in interest ("Sperry") also varied from location to location and, in some instances, from contract to contract at the same location. It therefore became impracticable for the parties to fashion a settlement that applied the same terms to each retiree covered by the instant consolidated action.

A summary of the proposed settlement's provisions with respect to each of the subclasses follows.

### Subclass No. 1—Vickers–Jackson Subclass

This Subclass is a class comprised of all retirees who (1) were eligible for retiree medical benefits, (2) were employed by Unisys or its corporate predecessor, (3) retired from Unisys' Jackson, Mississippi facility, and (4) were covered at the time of their retirement by a collective bargaining agreement between Unisys (or its predecessor) and IUE and its Local 792, which provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits.

Provided that they can establish insurability, individuals in this Subclass whose coverage has not expired as of the relevant implementation date (the "Implementation Date")—either as a result of attaining a specified age or reaching a coverage cap—may choose between two options with respect to their coverage and retiree contributions for that coverage. As a first option, each family group in this Subclass, whose coverage has not already expired, may make a one-time election, on or before the Implementation Date, to continue coverage for all eligible

**3.** Mr. Wasserman asserts that his law firm represents the plaintiffs in two separate actions brought against Unisys that are assigned to this Court: Engineers Union Local 444, IUE and Paul Walter v. Unisys Corporation, 92–CV–5389 (the *"Local 444* action"), and Zylla et al. v. Unisys, 94–CV–1965 (the *"Zylla* action"). The first of these actions is presently in arbitration.

**4.** This motion has been withdrawn by the defendants. The Court notes that, in any event, it would have been inclined to deny defendants' motion because Unisys' failure to join any putative class representatives as parties rendered this motion ex parte. The fact that class certification would have been sought on an opt-out basis pursuant to Fed.R.Civ.P. 23(b)(3), in the Court's view, does not overcome the justiciable deficiencies wrought by this unilateral application. Of

paramount concern, the Court regards Unisys' nonjoinder of any putative class representatives to pose a substantial risk that the concrete adversity of interest so fundamental to effective judicial decisionmaking would be lacking; the Court therefore would be curtailed in its ability to engage in the rigorous analysis necessary to determine whether the prerequisites for class certification had been met. Further, it remains highly curious to the Court why a unilateral application would be employed when Unisys, by serving a declaratory judgment complaint and thereafter moving to certify an adversarial class, could present the same issue in a manner designed to elicit an opposing response. *See* Memorandum and Order, 155 F.R.D. at 48 n. 5 (citing *In re Braniff Airways, Inc.,* 22 B.R. 1005, 1006, 1008 (Bankr.N.D.Tex.1982)).

family members under the plan of benefits in effect for the family group on December 31, 1992. For those electing such coverage, said coverage will continue until its expiration and will require a participant contribution equal to 20% of the participant's allocated cost, computed actuarially by reference to the actual cost experience of the covered individuals within this Subclass.

Unisys has agreed that it will not exercise any right to amend or otherwise change any such pre–1993 benefit plans in effect for this Subclass and waives any reservation of its right to do so.

If at any time after the Implementation Date the coverage of a participant or an eligible spouse expires, such individual, upon the occurrence of the first of these events, will be afforded a one-time option (per family) to enroll all eligible family members in the then-current Unisys PRM Plan at the same terms and conditions offered at that time and in the future to non-bargaining unit participants, at the lower of (1) the applicable contribution schedule announced by Unisys in October 1992, and (2) the rate for the Unisys PRM Plan which might result from any final court order in a pending multidistrict litigation action in the United States District Court for the Eastern District of Pennsylvania [the "Multidistrict Litigation Action"].

As a second option, individuals in this Subclass whose coverage has not expired will be afforded a one-time election (per family) to enroll all eligible family members in the current Unisys PRM Plan at the same terms and conditions offered at that time and in the future to non-bargaining-unit participants, at the lower of (1) the applicable contribution schedule announced by Unisys in October 1992, and (2) the rate for the Unisys PRM Plan which might result from any final court order in the Multidistrict Litigation Action.

### Subclass No. 2—Vickers–Troy Subclass

This Subclass is a class comprised of all retirees who (1) were eligible for retiree medical benefits, (2) were employed by Unisys or its predecessor, (3) retired from Unisys' Troy, Michigan facility, and (4) were covered at the time of their retirement by a collective bargaining agreement between Unisys (or its predecessor) and IUE and its Local 945 which provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits.

Provided that they can establish insurability, individuals in this Subclass whose coverage has not already expired as of the Implementation Date, through the realization of the coverage cap, may choose between two options with respect to their coverage and retiree contributions for that coverage. As a first option, each family group in this Subclass, whose coverage has not already expired, will be afforded a one-time election on or before the Implementation Date to continue to have all eligible family members covered by the plan of benefits which was in effect for the family group on December 31, 1992. For those electing such coverage, such coverage will continue until the expiration of that coverage through the realization of the coverage cap, and the electing persons will contribute 20% of the plan's cost in payment for such coverage. Such cost will be actuarially determined based upon the actual experience of the covered group.

Unisys has agreed that it will not exercise any right to amend or otherwise change any pre–1993 benefit plans in effect for this Subclass and waives any reservation of its right to do so.

If at any time after the Implementation Date the coverage of a participant or an eligible spouse expires, such individual, upon the occurrence of the first of these events, will be afforded a one-time election (per family) to enroll all eligible family members in the then-current Unisys PRM Plan at the same terms and conditions offered at that time and in the future to non-bargaining-unit participants. The applicable contribution schedule will be the lower of (1) the applicable contribution schedule announced by Unisys in October 1992, and (2) the rate for the Unisys PRM Plan which might result from any final court order in the Multidistrict Litigation Action.

As a second option, individuals in this Subclass whose coverage has not already expired through the attainment of a coverage cap,

will be afforded a one-time election (per family) to enroll all eligible family members in the current Unisys PRM Plan at the same terms and conditions offered at that time and in the future to non-bargaining-unit participants, at the lower of (1) the applicable contribution schedule announced by Unisys in October 1992, and (2) the rate for the Unisys PRM Plan which might result from any final court order in the Multidistrict Litigation Action.

### Subclass No. 3—Blue Bell Subclass

This Subclass is a class comprised of all retirees who (1) were eligible for retiree medical benefits, (2) were employed by Unisys or its predecessor, (3) retired from Unisys' Blue Bell, Pennsylvania facility, and (4) were covered at the time of their retirement by a collective bargaining agreement between Unisys (or its predecessor) and IUE and its Local 165 which provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits.

Provided that they can establish insurability, individuals in this Subclass who retired after December 31, 1984 will be given the option to continue to participate in and be covered by the Unisys PRM Plan at the same terms and conditions offered at that time and in the future to non-bargaining-unit participants. Their coverage and contribution rates, however, will be adjusted to conform to any final court order in the Multidistrict Litigation Action covering similarly situated, non-bargaining-unit retirees at Unisys' Blue Bell, Pennsylvania facility.

Individuals in this Subclass who retired on or before December 31, 1984 shall receive the remaining unutilized amount of their retiree medical benefits, if any, up to $1,064.00, in a lump-sum payment, upon the receipt of which they will forfeit any further entitlement to retiree medical coverage.

### Subclass No. 4—Waterbury Subclass

This Subclass is a class comprised of all retirees who (1) were eligible for retiree medical benefits, (2) were employed by Unisys or its predecessor, (3) retired from Unisys' Waterbury, Connecticut facility, and (4)

were covered at the time of their retirement by a collective bargaining agreement between Unisys (or its predecessor) and IBEW Local 1667 which provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits.

Provided that they can establish insurability, individuals in this Subclass will be given the option to participate in and be covered by the Unisys PRM Plan at the same terms and conditions offered at that time and in the future to non-bargaining-unit participants, except as provided below. Alternatively, individuals in this Subclass may elect to receive a lump-sum payment of $700.00, upon the receipt of which they will forfeit any further entitlement to retiree medical coverage.

Individuals who elect coverage in the Unisys PRM Plan will pay monthly contributions which will be the lesser of (1) a percentage of the plan's cost for that coverage, or (2) a certain dollar maximum.

The aforementioned cost percentage will be determined actuarially based upon the actual cost experience of the applicable group during the upcoming calendar year. The applicable percentage contribution rate for individuals in this Subclass will be 30% in 1994, 40% in 1995, and 5% in 1996 and thereafter.

The monthly contribution rates will be subject to the following ceilings: (1) for individuals who retired before January 1, 1987, the monthly maximum contribution will be $50.00 for participants 65 years of age or older, and $75.00 for participants under age 65; (2) for individuals who retired on or after January 1, 1987, the monthly maximum contribution will be $65.00 for participants 65 years of age or older, and $130.00 for participants under age 65. Finally, in no event will the contribution rate be higher than the rate for the Unisys PRM Plan which might result from any final court order in the Multidistrict Litigation Action for similarly-situated non-bargaining-unit retirees. Should the Unisys PRM Plan be terminated and a new plan of benefits offered to all of the then-current Unisys PRM Plan participants, the members of this Subclass will be offered that substitute plan of benefits under the same premium contri-

bution terms as applied above for the Unisys PRM Plan.

Should the Unisys PRM Plan be terminated and no new plan of benefits offered to all of the then-current Unisys PRM Plan participants, the members of this Subclass will be offered a plan of benefits, selected through a special designee [the "Special Designee"] upon notice and advice of members of the Subclass and with the approval of the Court. The above retiree contribution percentages and maximum retiree contribution rates will apply to any such subsequent plan, except that Unisys will continue its contributions for Subclass members at the per-participant dollar levels it was funding at the time of the termination of the Unisys PRM Plan. The amount contributed by Unisys in subsequent years may be increased by as much as 5% annually, but the actual amount of increase up to that amount will be indexed to the medical component of the Consumer Price Index. If the cost of any such subsequent plan exceeds the per-participant cost of the terminated Unisys PRM Plan, the members of the Subclass will be responsible for any additional cost.

### Subclass No. 5—Van Nuys Subclass

This Subclass is a class comprised of all retirees who (1) were eligible for retiree medical benefits, (2) were employed by Unisys or its predecessor, (3) retired from Unisys' Van Nuys, California facility, and (4) were covered at the time of their retirement by a collective bargaining agreement between Unisys (or its predecessor) and IUE and its Locals 854 or 1514 which provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits.

The individuals in this Subclass currently enrolled in the Unisys PRM Plan will remain entitled to participate in such plan upon the same terms and conditions offered at that time and in the future to non-bargaining participants, for which such individuals will pay the retiree contribution schedule announced by Unisys in October 1992, or such individuals may elect a lump-sum payment of $400.00, upon the receipt of which they will forfeit any further entitlement to retiree medical coverage.

### Subclass No. 6—VRIP Subclass

This Subclass is a class comprised of all retirees who (1) were eligible for retiree medical benefits, (2) were employed by Unisys or its predecessor, (3) retired from Unisys' Great Neck, New York facility as part of the 1986 Voluntary Retirement Incentive Plan, and (4) were covered at the time of their retirement by a collective bargaining agreement between Unisys (or its predecessor) and IUE and its Locals 445, 450 and 470 or IBEW Local 3 which provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits.

Individuals in this Subclass will be subject to the same provisions as set forth for Subclass No. 8, *provided* that upon any final order or settlement for identically-situated 1986 VRIP non-bargaining unit Sperry retirees in the Multidistrict Litigation Action, individuals in this Subclass will upon reasonable notice from Unisys be afforded at least thirty days to make a one-time election to accept the terms established by said Multidistrict Litigation Action, and *provided further* that such election will be available only if the Unisys PRM Plan is in effect at that time. Upon such election, the terms and conditions established for these individuals under the provisions applicable to Subclass No. 8 will be forfeited.

All retiree contributions made by a retiree prior to such election will remain in the trust account established by the Stipulation of Settlement for Subclasses Nos. 7 and 8. There will be no refund or credit for contributions paid by the retiree prior to his or her election to participate in the Unisys PRM Plan.

For each individual who elects to participate in the Unisys PRM Plan, a determination will be made actuarially as to Unisys' share of the amount no longer required for securing that individual's benefit under the provisions applicable to Subclass No. 8. If Unisys has not yet deposited or transferred into the Primary Settlement Account an amount sufficient to bring the level of funding for the Covered Group up to 90% of

Unisys' share of its cost for providing the Plan of Benefits for this group, the amount determined to be no longer required for securing the electing individuals' benefits will remain in the Primary Settlement Account to the extent necessary to reach the 90% level. If the 90% level has been reached, any amount in excess of the 90% level will then be credited from the Primary Settlement Account into a general account in the Harris Trust and Savings Bank [the "Harris Trust"] to be used consistent with the purpose and operation of the Harris Trust, including but not limited to payment of that individual's benefit.

### Subclass No. 7—Great Neck GHI Subclass

This Subclass is a class comprised of all retirees who (1) were eligible for retiree medical benefits, (2) were employed by Unisys or its predecessor, (3) retired from Unisys' Great Neck, New York facility, and (4) were covered at the time of their retirement by a collective bargaining agreement between Unisys (or its predecessor) and IUE and its Locals 445, 450 and 470 in effect prior to September 26, 1979, or by a corresponding agreement with IBEW Local 3, which provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits.

Individuals in this Subclass, which includes individuals covered by a GHI or GHP plan, and their spouses and eligible dependents, will continue to receive their present coverage, which for GHI participants consists of (1) payment of the Medicare Part A deductible (currently $696 per year), and (2) a free annual physical examination at a designated physician's office.

In addition, all individuals in this Subclass will be offered the opportunity to purchase prescriptions at the Unisys PRM Plan discount rate at participating pharmacies, including the mail order prescription drug program. A list of such participating pharmacies, and a card identifying the individuals in this Subclass as eligible for this discount, will be provided to each member of this Subclass.

Individuals in this Subclass will not be required to make any contribution for their coverage, and their benefits will be secured by the Primary Settlement Account described and defined below in the provisions concerning Subclass No. 8.

Unisys has agreed that it will not exercise any right to amend or otherwise change the benefits described above and waives any reservation of its right to do so.

### Subclass No. 8—Great Neck 1979–1991 Subclass

This Subclass is a class comprised of all retirees who (1) were eligible for retiree medical benefits, (2) were employed by Unisys or its predecessor, (3) retired from Unisys' Great Neck, New York facility, and (4) were covered at the time of their retirement by a collective bargaining agreement between Unisys (or its predecessor) and IUE and its Locals 445, 450 and 470 in effect on or after September 26, 1979, but before September 6, 1991, or by a corresponding agreement with IBEW Local 3, which provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits.

### (A) Definitions

The following definitions apply in connection with the settlement for this Subclass.

### 1. Present Value of Medical Costs

This is defined as the present value, measured as of a particular date, of (1) the expected cost of medical and drug claims under the Plan of Benefits agreed upon by the parties, as discussed and defined within the Stipulation of Settlement (the "Plan of Benefits"), and (2) the cost of administering the Plan of Benefits. This amount will be measured based upon assumptions agreed upon by the actuaries, or if the actuaries do not agree, by the independent actuary appointed under the provisions set forth in the Stipulation of Settlement. This amount will include any payments, charges, assessments, contributions, premiums, maintenance of effort provisions, any taxes or expenses in any form as well as any administrative costs related to the computation or payment of the same required by any federal or state law, or

related to the provision of medical coverage to individuals covered by this settlement.

## 2. *Present Value of Future Retiree Contributions*

This is defined as the present value, measured as of a particular date, of the expected retiree contributions for the Plan of Benefits agreed upon by the parties. This amount will be measured based upon assumptions agreed upon by the actuaries, or if the actuaries do not agree, by the independent actuary appointed under the provisions set forth in the Stipulation of Settlement. This amount will reflect any change in future retiree contributions due to the implementation and operation of any of the three Triggers, as discussed *infra*, at any point prior to the measurement date or at the time of any future valuation.

## 3. *Retiree Share*

The retiree share of the cost of providing for future medical benefits is equal to the Present Value of Future Retiree Contributions (measured as of the Implementation Date) divided by the Present Value of Future Medical Costs (measured as of the Implementation Date).

## 4. *Retiree Assets*

A separate accounting will be made within the commingled assets of the trust for Retiree Assets. The initial value of the Retiree Assets as of the Implementation Date will be zero. The Retiree Assets will be credited with the retiree contributions made under the Stipulation of Settlement and with a *pro rata* share of the actual investment earnings of the commingled fund (including realized and unrealized gains and losses). The Retiree Assets will be charged with (1) the cost of medical and drug claims under the benefit arrangements agreed to by the parties multiplied by the Retiree Share, and (2) the cost of administering the Plan of Benefits multiplied by the Retiree Share (Cost of Benefits × Retiree Share + Cost of Administration × Retiree Share = Charge to Retiree Assets).

## 5. *Valuation Date*

The three Triggers, as defined in the Stipulation of Settlement, will be measured in the year specified as of July 1st.

## (B) *The Primary Settlement Account*

Within twenty days after the Implementation Date, Unisys will establish a new account within an existing trust (the "Harris Trust"). This new account is referred to by the Stipulation of Settlement as the "Primary Settlement Account."

Within twenty days after the Implementation Date, Unisys will credit to the Primary Settlement Account an amount, as calculated by the formula specified below, to be used to fund substantially the Plan of Benefits described in the Stipulation of Settlement for this Subclass and also for Subclass No. 7 (the "Covered Group"). In Unisys' discretion, these funds may be credited to the Primary Settlement Account from funds currently held in the Harris Trust and/or from funds contributed by Unisys to the Harris Trust in the future.

The amount to be credited will be equal to 80% of Unisys' share of its cost for providing the Plan of Benefits to this Covered Group, i.e., the Present Value of Medical Costs for the Covered Group of Great Neck Conference Board retirees, as of the Implementation Date, minus the Present Value of Future Retiree Contributions for this Covered Group, as of the Implementation Date.

Thereafter, Unisys has agreed that, within two years of the Implementation Date, it will credit to the Primary Settlement Account an amount sufficient to bring the level of funding for the Covered Group up to 90% of Unisys' share of its cost for providing the Plan of Benefits for this group. In Unisys' discretion, these funds may be credited to the Primary Settlement Account from funds currently held in the Harris Trust and/or from funds contributed by Unisys to the Harris Trust in the future.

Unisys is responsible for 100% of its share of the cost for providing the Plan of Benefits for this Covered Group, *provided* that Unisys' costs will be capped and any require-

ment for additional contributions will be released under the following circumstances:

    1) Trigger Two, as discussed *infra*, is activated for three consecutive years; or

    2) Trigger Three, as discussed *infra*, is activated; or

    3) Unisys credits to the Primary Settlement Account within four (4) years of the Implementation Date the remaining 10% needed to bring Unisys' contributions for its share of the cost of providing the Plan of Benefits for the Covered Group to 100%. In Unisys' discretion, these funds may be credited to the Primary Settlement Account from funds currently held in the Harris Trust and/or from funds contributed by Unisys to the Harris Trust in the future.

### (C) *Actuarial Assumptions*

The actuarial assumptions to be used by the parties will be determined upon their mutual agreement, and such agreement constitutes a material condition of the Stipulation of Settlement. If in respect to any future valuations, the parties cannot agree on any actuarial assumption(s), the issue(s) will be submitted to an independent actuary, who will hear the arguments of the parties and make a binding decision concerning the assumption(s) to be used. The parties will endeavor to reach an agreement upon such independent actuary, but if they are unable to do so, on petition of either party, the Court will designate the actuary subject only to for-cause challenge by either party, which will be determined by the Court.

In order to enhance the accuracy of the actuarial calculations used in the Stipulation of Settlement, such calculations will not be performed until after it is determined with finality the identity of all retirees, and eligible spouses and dependents thereof, who will be in the Covered Group and what Plan of Benefits will be selected by each individual. Such election will be made at least ten (10) days prior to the Implementation Date.

### (D) *The Plan of Benefits*

Subclass members will have the option of choosing between three different types of coverage:

### 1. *The Comprehensive Settlement Plan of Benefits*

Under the first option, Subclass members, provided that they can establish insurability, can elect a form of comprehensive medical coverage that contains a prescription drug plan (the "Comprehensive Settlement Plan of Benefits"). This coverage will use as its base the plan of benefits received by individuals who retired under the Conference Board Collective Bargaining Agreements in effect on January 1, 1991 for the Great Neck, New York facility with certain specific modifications, which were set forth in a chart attached to the Notice sent to Subclass members, and have been incorporated by reference into the Stipulation of Settlement.

### 2. *The HMO Plan of Benefits*

Subclass members who are currently covered by HMO's will continue to receive the same plan of benefits offered by the HMO in which they are currently enrolled, on the same basis as currently exists, as long as that HMO continues to offer a plan of benefits to those retirees (the "HMO Plan of Benefits"). Each individual currently enrolled in a HMO will retain the option, during the annual enrollment period, to change his or her coverage to receive the Comprehensive Settlement Plan of Benefits. Each participant who wishes to remain in a HMO will make the agreed upon premium contributions, as described below, plus any difference above the per-participant cost of the Comprehensive Settlement Plan of Benefits. In the event the individual moves outside a HMO's service area or a HMO's plan of coverage is terminated, the individual will be offered the opportunity of choosing the Comprehensive Settlement Plan of Benefits as described above or the Settlement Drug-Only Option described *infra*. This is a one-time option and once an individual switches to the Comprehensive Settlement Plan of Benefits or the Settlement Drug-Only Option he or she cannot thereafter switch to a HMO.

### 3. *The Settlement Drug-Only Option*

Subclass members may choose a plan that provides only prescription drug coverage

without any other type of benefits (the "Settlement Drug–Only Option"). These retirees must make this election at least ten days prior to the Implementation Date so that accurate actuarial calculations, which could be affected by levels of participation, can be made. A retiree who elects the Settlement Drug–Only Option will not be permitted to change this election in the future. Further, if elected, this option must apply to the retiree and each eligible spouse and dependent. Persons who elect the Comprehensive Settlement Plan of Benefits will be afforded subsequent windows on every five-year anniversary of the Implementation Date to change their election to the Settlement Drug–Only Option.

Any Subclass member who chooses the Settlement Drug–Only Option will pay $7.50 per month per covered participant in 1994. This amount will be adjusted in future years by the National Bureau of Labor Statistics published medical component of the Consumer Price Index, measured as of July 1, 1994 and each subsequent July 1. Any adjustment which results from any such measurement will be implemented on January 1 following the measurement.

(E) *Retiree Contributions*

1. Retiree contributions for the Comprehensive Settlement Plan of Benefits defined above will be made as follows:

(a) All pre–65 retirees and their spouses and dependents will pay $100 per month per covered participant until the participant becomes age 65. This monthly payment is per covered participant, but is subject to a contribution ceiling whereby no retiree with a spouse and more than one other dependent enrolled in the Plan will have to pay more than $300 per month.

(b) All post–65 retirees who retired during the term of the 1979 Collective Bargaining Agreements among Unisys and the IUE and IBEW Local 3 will pay $25 per month per covered participant in 1994 and $40 per month per covered participant thereafter, subject to the 20% Maximum Percentage discussed and defined below, effective January 1, 2004 or sooner in the event that Trigger One, as discussed *infra*, is activated. These monthly payments are per covered participant at the applicable rate.

(c) All post–65 retirees who retired after the expiration of the 1979 Collective Bargaining Agreements will pay $25 per month in 1994, $40 per month in 1995 and $50 per month thereafter. This is also a per-covered-participant rate and is subject to the 20% Maximum Percentage discussed below, effective January 1, 2004 or sooner in the event that Trigger One, as discussed *infra*, is activated.

(d) In chart form, the monthly contributions of retirees (per covered participant) will be:

|  | 1994 | 1995 | 1996 | 1997 | 1998–2003 |
|---|---|---|---|---|---|
| Age 65 and Over Full Coverage with Prescription Drug Plan | $25 | $40 ** | $50 | $50 | $50 * |
| Pre–65 Full Coverage with Prescription Drug Plan | $100 *** | $100 | $100 | $100 | $100 |
| Prescription Drug Only Plan (over and under 65) | $7.50 | For 1995 and beyond, the $7.50 cost will be adjusted by the health care component of the Consumer Price Index. | | | |

\* Effective January 1, 2004 and thereafter, or sooner if Trigger One is activated, contributions will be capped at the last scheduled amount above ($50, or $40 for 1979 contract retirees), or be set at 20% of the applicable premium, *whichever is less.*

\*\* Employees who retired during the term of the 1979 Collective Bargaining Agreement, and their spouses and eligible dependents, will have their contributions capped at $40 until January 1, 2004, or sooner if Trigger One is activated, when they will also become subject to the 20% cap set forth above.

*** Once an individual who is not over age 65 becomes 65, he or she will switch to the *contribution level then in effect under the schedule for post–65 individuals.* The 20% Maximum Percentage will not apply to any pre–65 retiree or their eligible spouses or dependents.

---

2. Retirees who choose to continue to participate in the HMO Plan of Benefits will pay for any difference between the cost of participation in the HMO selected and the cost of coverage for the individual if he or she were participating in the Comprehensive Settlement Plan of Benefits, plus the amount which the retiree would have to pay for the Comprehensive Settlement Plan of Benefits. The amount a retiree will have to pay for HMO coverage can change each year based upon the contribution schedule set forth in the Stipulation, and/or the cost each year of coverage under the HMO and the Comprehensive Settlement Plan of Benefits. If the cost of coverage under the HMO is less than the cost of coverage if the individual were participating in the Comprehensive Settlement Plan of Benefits, the individual will pay the amount required for the Comprehensive Settlement Plan of Benefits.

3. *The Maximum Percentage*

Effective January 1, 2004 (or earlier in the event Trigger One is activated as discussed below) and thereafter, contributions for retirees over age 65 will be capped at the last scheduled flat rate amount or be 20% of the applicable premium as determined each year by the actuaries, whichever is less. In other words, a retiree's contribution would be no more than the lesser of 20% of the projected cost of providing the Plan of Benefits for the coming year or the $50 or $40 monthly cap applicable to that retiree and his or her eligible spouse and dependents. However, for purposes only of determining the assumed liability of Unisys as set forth in the Stipulation of Settlement, it is assumed that in no event will the contribution of any retiree be less than 15% of the applicable premium.

(F) *The Three Triggers*

To address the possible implementation of major changes in Medicare, the enactment of national or state health insurance reforms, actuarial gains and losses, or any other situa-

tion that could result in the Primary Settlement Account becoming substantially overfunded, the parties have agreed upon a series of steps ("Triggers") designed to reduce such overfunding, and to ensure that the level of retiree contributions do not exceed the level of Retiree Share agreed upon by the parties.

1. *Trigger One*

This Trigger is intended to deal with health care legislation or any other development that substantially reduces the Present Value of Medical Costs. It provides that if national or state health insurance reforms or Medicare changes are enacted, there are actuarial gains or losses, or some other factor results in the Primary Settlement Account becoming substantially overfunded, an adjustment can be made to the agreed upon schedule of contributions to be made by the applicable Subclass members.

The precise formula for determining when and if Trigger One applies is:

If on any two consecutive Valuation Dates after January 1, 1996 the product of Present Value of Medical Costs multiplied by the Retiree Share multiplied by 120% is less than the sum of Retiree Assets plus the Present Value of Future Retiree Contributions, then the Maximum Percentage provision described in the Stipulation of Settlement will move forward and apply, effective January 1 of the following calendar year.

2. *Trigger Two*

This Trigger is intended to be activated when further retiree contributions are not needed to provide for the Plan of Benefits because there are already sufficient funds in the Primary Settlement Account to fund the Plan of Benefits for the individuals covered by this account.

The precise formula for determining when and if Trigger Two applies is:

If as of any Valuation Date after January 1, 1998 the product of Present Value of Medi-

cal Costs multiplied by Retiree Share is less than Retiree Assets, then all retiree contributions shall cease, effective January 1 of the following calendar year.

If, after a period during which retiree contributions have not been paid, it is determined that Retiree Assets are less than the Present Value of Medical Costs multiplied by Retiree Share, contributions would once again be paid by the applicable Subclass members at the level then in effect.

If Trigger Two is activated in three consecutive years, no further Unisys contributions will ever be required.

### 3. *Trigger Three*

This Trigger deals with the possibility that, due to unforeseen changes in the law, investment earnings substantially exceeding actuarial assumptions, unfortunate mortality, or other factors, the Primary Settlement Account becomes overfunded by 30% or more. Upon activation of this Trigger, Subclass members could have a portion of their contributions, plus the income earned on such portion of contributions, returned to them as a reimbursement for the purchase of some form of medical insurance benefit(s) for which such reimbursement is permitted under the law and consistent with the purpose and operation of the Harris Trust.

The precise formula for determining when and if Trigger Three applies is:

If on any three (3) consecutive Valuation Dates after January 1, 1998 the Present Value of Medical Costs multiplied by Retiree Share multiplied by 130% is less than Retiree Assets, then any retiree assets in excess of 130% may be paid to any surviving Subclass members to reimburse the cost of any medical insurance benefit(s) for which such reimbursement is permitted under the law and consistent with the purpose and operation of the Harris Trust. Any such reimbursement will be paid to surviving Subclass members (1) in one lump sum, (2) on or about December 31 of the year in which the valuation leading to the application of Trigger Three is conducted, and (3) only upon the receipt of some appropriate form of proof that a Subclass member has incurred the cost of purchasing medical benefits for which reimbursement can be made. If all of the excess retiree assets are not reimbursed on the first December 31 following the valuation date activating Trigger Three, the remaining excess assets may be reimbursed in lump sum payments on subsequent December 31 dates, in accordance with points (1), (2) and (3) of the previous sentence, until the excess retiree assets are exhausted.

If Trigger Three is activated, no further Unisys contribution will ever be required. At the same time, any contributions by Unisys in excess of 130% of the funds needed to pay Unisys' share of the cost for the agreed-upon Plan of Benefits (with interest) can, in Unisys' sole discretion, immediately be credited back to other accounts in the Harris Trust to pay for the health care benefits of Conference Board bargaining-unit employees and retirees consistent with the purpose and operation of the Harris Trust.

### (G) *Waiver of Reservation of Rights*

Unisys has further agreed that it will not exercise any right to amend or otherwise change the Comprehensive Settlement Plan of Benefits and the Settlement Drug–Only Option as defined in the Stipulation of Settlement, and waives any reservation of its right to do so.

### (H) *Transition Period*

The Plan of Benefits elected by each applicable Subclass member will begin on the first day of the month following the Implementation Date. The parties have further agreed that the applicable Subclass members (including eligible spouses and dependents) will be relieved of the obligation to pay the higher rates implemented by Unisys effective January 1, 1994, pending the approval of this settlement, *provided* that under any circumstances the rate of contributions set forth earlier for the Comprehensive Settlement Plan of Benefits for 1994 may be imposed as of July 1, 1994, and *provided* further that the rates set forth herein for 1995 may be imposed as of September 1, 1994, in the event that the Implementation Date is later than September 1, 1994. (In the event the settlement were disapproved by the Court, the

higher January 1, 1994 rates (or any subsequent rates) implemented by Unisys could be immediately imposed as of the first day of the month following the Court's disapproval of the settlement.)

### Subclass No. 9—Great Neck Current Contract Retirees Subclass

This Subclass is a class comprised of all current or future retirees who (1) are eligible for retiree medical benefits, (2) are or have been employed by Unisys or its predecessor, and (3) retire or have retired from Unisys' Great Neck, New York facility under the terms of the current collective bargaining agreements now in effect between Unisys (or its predecessor) and IUE and its Locals 445, 450, 470 or IBEW Local 3, which provide medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits (the "Current Contract Retirees").

Individuals in this Subclass will receive the plan of benefits provided for under the Collective Bargaining Agreements now in effect among Unisys and the IUE and its Locals 445, 450 and 470 and IBEW Local 3 (the "Current Collective Bargaining Agreements"). Such individuals will pay the contributions as negotiated and applied to retirees in the Current Collective Bargaining Agreements for the remainder of the term of the Agreements. Thereafter, the monthly contributions last specified under the Current Collective Bargaining Agreements will be frozen and these retirees will never be required to make greater contributions. The plan of benefits provided to retirees under the Current Collective Bargaining Agreements will not be changed for these retirees. In order to participate in the settlement, Current Contract Retirees must retire prior to the expiration of the Current Collective Bargaining Agreements.

Unisys has agreed that it will not exercise any right to amend or otherwise change any such benefit plan for these retirees and waives any reservation of its right to do so.

The future medical costs, future retiree contributions, and retiree assets of the Current Contract Retirees will not be included in calculating the Present Value of Medical Costs, Present Value of Future Retiree Con-

tributions, Retiree Share or Retiree Assets for any other Settlement Class Members for purposes of any of the provisions of the Stipulation of Settlement and a separate accounting will be kept for this group.

Within twenty days after the Implementation Date, a second account (the "Supplemental Account") will be established as a new, separate account under the Harris Trust. Monies credited to this Account will be used to fund the plan of benefits for the Current Contract Retirees.

Unisys is responsible for the payment of the medical insurance claims of the Current Contract Retirees, and will determine alone how it will satisfy this responsibility. As a form of security for the Current Contract Retirees, Unisys has agreed, however, that on or before the expiration of the Current Collective Bargaining Agreements between Unisys and the Conference Board, or twenty days after the Implementation Date (whichever is later), Unisys will credit to the Supplemental Account a flat amount for each Current Contract Retiree to be mutually decided upon by the parties, *provided* that the parties agree that such amounts will not exceed in the aggregate Two Million Five Hundred Thousand Dollars ($2,500,000), to fund partially the Plan of Benefits for the Current Contract Retirees. In Unisys' discretion, these funds may be credited to the Primary Settlement Account from funds currently held in the Harris Trust and/or from funds contributed by Unisys to the Harris Trust in the future.

The remaining contributions made by Unisys to fund the plan of benefits for the Current Contract Retirees may be credited to the Supplemental Account at such times and in such amounts as Unisys may unilaterally determine in its sole discretion. In Unisys' discretion, these funds may be credited to the Primary Settlement Account from funds currently held in the Harris Trust and/or from funds contributed by Unisys to the Harris Trust in the future.

### Provisions Applicable Only to Subclasses 7, 8 and 9

(A) *Changes in Health Care*

In the event that, at any time after the Implementation Date and the establishment

of the Primary Settlement and Supplemental Accounts, some national or state health insurance reform or similar legislation is enacted that requires Unisys to make payments to provide some type of contribution for health care coverage on behalf of these Subclass members beyond the contribution level agreed upon in the Stipulation of Settlement, this payment will come out of the applicable settlement trust account. Moreover, the parties recognize that it is possible that prescription drugs will become covered by Medicare, or that Unisys may face other, unanticipated additional costs in connection with the provision of the medical coverage provided to these Subclass members. Such costs could also be paid out of the applicable accounts established by the Stipulation of Settlement. Such payments may include any payments, charges, assessments, contributions, premiums, maintenance of effort provision, any taxes or expenses in any form, as well as any administrative costs related to the computation or payment of the same required by any federal or state law, or related to the provision of medical coverage to individuals covered by the Stipulation of Settlement.

(B) *Sale of Unisys*

In the event of any acquisition of Unisys, Unisys will either continue to maintain the assets held in the Primary Settlement and Supplemental Accounts, established in accordance with the terms of the Stipulation of Settlement or, if the assets are transferred, will require the purchaser to maintain these trust accounts so that all transferred assets are utilized for the payment of the retiree and spouse and dependent claims as provided for in the Stipulation of Settlement. To the extent that Unisys has not, as of the date of any such acquisition of Unisys, deposited or transferred into the Primary Settlement Account the remaining amount of its share of the cost for providing the Plan of Benefits for Subclasses 7 and 8, Unisys has agreed to deposit or transfer such remaining amount before the closing date for the acquisition.

#### *Provisions of General Application*

(A) *One–Shot Plan Retirees*

Union plaintiffs have identified a number of collective bargaining agreements that set forth retiree medical insurance benefits not to exceed $1,064. Individuals who retired under these contracts, with the exception of individuals covered by the provisions applicable to Subclass No. 3 (i.e., the Blue Bell Subclass), who are identified and agreed upon by the parties to be eligible for benefits will receive the remaining unutilized sum of their retiree medical benefit, up to $1,064, in a lump-sum payment, upon receipt of which they will forfeit any entitlement to retiree medical coverage. The Stipulation of Settlement provides, however, that no such individual will receive the lump-sum payment in the event that their benefits are subject to a reduction for Medicare payments set forth in applicable collective bargaining agreements or plan documents.

(B) *Retirees from IUE Customer Engineer Local Unions*

The parties have identified certain individuals who retired under various collective bargaining agreements between Unisys and the IUE and its Customer Engineer Locals that provided medical benefits for retirees, and/or their spouses and dependents eligible to receive medical benefits. Provided that they can establish insurability, the individuals in this group currently enrolled in the Unisys PRM Plan, and those individuals in this group who declined to enroll when offered the opportunity in October 1992, will be given the option to participate in the Unisys PRM Plan at the same terms and conditions offered at that time and in the future to non-bargaining-unit participants. The coverage and contribution rates of these individuals, however, will be adjusted to conform to any final court order covering non-bargaining-unit retirees in the Multidistrict Litigation Action.

C. *Notice To Class Members As Directed By The Preliminary Order Dated April 8, 1994*

By its Preliminary Order dated April 8, 1994, the Court directed that separate notice be provided to the members of each subclass regarding the conditional certification of the nine separate subclasses, the elements of the

proposed settlement, and the scheduling of a hearing to determine whether the proposed settlement was fair and reasonable to the settling class members. Although these notices varied with respect to their discussion of the benefits of the settlement to each particular subclass, certain elements of the notices were common to all of the subclasses. For example, in addition to describing the nature of the litigation including the claims that would be released, and informing the class members of the June 3, 1994 fairness hearing and the procedures for voicing objection, the notices for each subclass described in general terms the benefits to be obtained by *each* of the settling subclasses. This allowed the members of the various subclasses to compare their benefits vis-a-vis the other subclasses and object if they found their interests to be inadequately represented. Thus, by way of illustration, within the notices sent to each subclass is a sentence appearing in bold capitals informing all of the class members that only subclasses 7, 8, and 9 would be the beneficiaries of substantially-funded trust accounts. Further, the notices informed the class members that Unisys had consented to the payment of reasonable attorney's fees and costs for class counsel with funds entirely separate from those used to pay the class members' benefits.

Further, strong assurance exists that almost all of the class members in this action have learned of the proposed settlement. Class counsel has testified as to its continual updating of its mailing list that was originally provided by Unisys with respect to those former employees who participated in Unisys' insurance programs that are the subject of the instant litigation. Counsel has further testified that this list was tested prior to the Court's approval of notice through informal mailings to class members to alert them of information meetings concerning the impending settlement, and updated by following up those envelopes that were returned indicating incorrect addresses. Moreover, class counsel established and maintained a toll-free "800" telephone number for the purpose of handling inquiries or questions about the Court's procedures regarding this case and the terms of the proposed settlement. *See*

Aff. of Notification to Class (E.D.N.Y. June 2, 1994).

### D. *Fairness Hearing*

The Court held a settlement approval hearing on June 3, 1994. At this hearing, the Court entertained the arguments of counsel concerning whether the proposed settlement was fair and reasonable to the settling classes. The Court also elicited testimony from a representative of the actuarial firm engaged by class counsel in connection with the establishment of trust accounts for subclasses 7, 8, and 9 to offer his perspective of the settlement vis-a-vis other employee benefit litigation settlements that he has observed. The Court further considered the concerns of amicus curiae with respect to the scope of the judgment, and his concomitant concern that "Court approval of the Settlement Stipulation should not under any circumstances be construed as a *sub silentio* adjudication of the allocation rights of the Local 444 retirees vis-a-vis the Conference Board retirees." Letter of James Wasserman, Esq. dated June 2, 1994, at 8. Aside from Mr. Wasserman, no person appeared at this hearing to oppose the settlement.

Although only one class member who objected in writing formally complied with the procedures for being heard, the Court waived this procedural requirement and considered each of the written comments submitted to the Court in connection with the proposed settlement. Each of these written comments was addressed individually by class counsel, which further responded to the Court's inquiries as to the peculiar circumstances, if any, faced by each individual writer. The letters ranged from expressions of unmitigated outrage concerning Unisys' actions in unilaterally abrogating the Conference Board retiree's medical contribution schedule in view of a purported representation of lifetime benefits, to tempered rationalizations that regarded the proposed settlement as an unavoidable consequence of a complex and uncertain litigation. In total, the Court received 48 letters as of the date of the fairness hearing. 31 of these letters were submitted by persons identified as class members. The remaining 17 letters were submitted by non-

class members who were not covered by the settlement. Of the 31 class members who wrote the Court, their composition by subclass was as follows:

| Subclass | Letters to the Court | Number of Persons in Subclass | Percentage of Persons to Write the Court |
|---|---|---|---|
| 1 | 0 | 62 | 0% |
| 2 | 0 | 112 | 0% |
| 3 | 0 | 58 | 0% |
| 4 | 7 | 205 | 3.41% |
| 5 | 0 | 18 | 0% |
| 6 | 7 | 119 | 5.88% |
| 7 | 0 | 568 | 0% |
| 8 | 15 | 962 | 1.56% |
| 9 | 2 | 155 | 1.29% |
| Totals | 31 | 2,259 | 1.37% |

### E. *Supplemental Submissions Of Class Counsel*

In addition to the written materials submitted and the evidence presented at the June 3, 1994 fairness hearing, the Court requested that supplementary information be filed to satisfy itself as to certain concerns for which further exposition was desired. Included among the materials requested was census data concerning the persons who submitted letters to the Court, and the number of persons within each subclass. This information appears at the end of the preceding section *supra*.

The Court also requested that class counsel provide a mathematical analysis comparing the benefits to be attained by each subclass pursuant to the settlement to the level of the benefits that would be achievable if the plaintiffs prevailed at trial. The results suggested by plaintiff's counsel appear below.

| Subclass | Estimated Percentage Recovery Achievable Through Settlement | Comments |
|---|---|---|
| 1 | 80% | (Plus the undeterminable value of providing an additional coverage option to participants through the Unisys PRM Insurance Plan if contractual coverage is exhausted.) |
| 2 | 80% | (Plus the undeterminable value of providing an additional coverage to participants through the Unisys PRM Insurance Plan when contractual coverage is exhausted.) |
| 3 | 100%<br>100% | Pre–12/31/84 Retirees<br>Post–12/31/84 Retirees<br><br>(Plus the undeterminable value of providing an additional coverage to participants through the Unisys PRM Insurance Plan when contractual coverage is exhausted.) |
| 4 | 60% to 80% | Depending upon prior employee contribution obligations and life expectancy. Plus the value of the $700 "buy-out" option and guarantees of future insurance coverage if the Unisys PRM Plan is discontinued. |

| Subclass | Estimated Percentage Recovery Achievable Through Settlement | Comments |
|---|---|---|
| 5 | 100% | (Plus the undeterminable value of providing an additional coverage to participants through the Unisys PRM Insurance Plan when contractual coverage is exhausted.) |
| 6 | N/A | As to benefits secured by collective bargaining, the same as Subclass 8. As to individual contractual rights arising from unilateral or bilateral contracts between Unisys and the individual retiree, no compromise is contained in this settlement. These rights will be resolved in the *In Re Unisys Retiree Medical Insurance* litigation in the United States District Court for the Eastern District of Pennsylvania. |
| 7 | 100% | (Plus the value of prescription discount drug and mail order prescription drug programs and the value of lifetime security through the Primary Settlement Account.) |
| 8 | 77% | (Plus the undeterminable value of the Drug Only Option program; plus the security provided by the Primary Settlement Account. Moreover, the potential of contributions being reduced, abated, or even returned as a result of Triggers 1, 2 and 3 is *not* calculated, although the activation of each Trigger would substantially *increase* the percentage of total recovery; if all three Triggers were activated, might result in affected participants receiving *in excess of 100%* of the benefits provided for under their contracts at the time of retirement.) |
| 9 | 100% | (Plus security of the supplemental account.) |

---

Supplemental Declaration of Everett E. Lewis, Esq. in Support of the Fairness of the Settlement ¶ 7 (E.D.N.Y. June 9, 1994).

The Court further requested and obtained additional information pertaining to Subclass 8, including a letter from an actuarial consultant who was familiar with the benefits to be obtained by this subclass. According to the actuary, the benefits to be procured by members of this subclass, specifically in the area of the proposed settlement's mail order program for prescription drugs, were substantially superior (i.e., less costly) than comparable benefits typically available under a "traditional major medical approach." *Id.* Ex. A (Letter of Jonathan Parker to James Mauro, Esq. dated June 7, 1994).

Further, class counsel has informed the Court of a June 23, 1994 decision upon a bench trial by Chief Judge Edward N. Cahn, United States District Judge for the Eastern District of Pennsylvania, in a consolidated multidistrict litigation of non-union cases involving arguably similar Unisys Corporation Medical Benefit ERISA issues to those presented in the instant action. *In Re Unisys Corporation Retiree Medical Benefits ERISA Litigation,* MDL No. 969, 1994 WL 6883 (E.D.Pa. June 23, 1994). For the most part, Judge Cahn ruled in favor of Unisys, finding that the union plaintiffs were unable to establish that their right to medical benefits had vested in view of plan provisions that reserved Unisys' right to terminate unilater-

ally the medical plans in question. *See id.* at 91. Judge Cahn did however find, with respect to one of the subclasses, that a viable breach-of-fiduciary-duty claim under ERISA could exist, and therefore granted a motion for reconsideration of his earlier order directing summary judgment in favor of the defendant on this issue. *See id.* at 68–69, 76–77. Although the Multidistrict Litigation Action is not controlling precedent upon this Court, it nevertheless constitutes a further indicia of the present jurisprudential climate and arguably heightens the desirability of settlement to the class members.

### F. *Subsequent Non–Response Of Amicus Curiae Regarding Scope Of Judgment And New Assertions Regarding Sufficiency Of Notice*

#### 1. *Procedural Posture and Assertions of Amicus Curiae*

At the fairness hearing, the Court further established a time frame for the submission by the parties of the proposed final order and judgment, including a briefing schedule to allow amicus curiae to monitor this proposed final adjudication and file with the Court its objections, if any, to its scope. Unisys and the Conference Board class plaintiffs were thereafter given the opportunity to respond to any objections.

Mr. Wasserman does not contest the scope of the judgment. Instead, amicus curiae now requests that the Court direct class counsel to renotice the members of subclass 8 to provide them with disclosure of the fact that Sperry—Unisys' corporate predecessor—had for more than two decades maintained a reserve account within a funding vehicle related to its pension plan that covered employees at the Great Neck facility, and that by 1992 the reserve's assets exceeded $14 million, while the cost of post-retirement medical benefits for both the Local 444 and the Conference Board retirees only averaged approximately $2 million annually. He further asserts that the funding vehicle in question was known as the Group Annuity Contract No. 1150 between John Hancock Mutual Life Insurance Company and Sperry ("GAC 1150"), while the reserve account was designated as the "Restricted Portion" of the Pension Ad-

ministration Fund of the GAC 1150. GAC 1150 documents defined the Restricted Portion as "that portion of the Pension Administration Fund into which payments made by the Employer in accordance with the Post Retirement Medical Benefit Plan are to be accumulated." Memorandum of Amicus Curiae Requesting Renoticing of Subclass, Ex. C (E.D.N.Y. June 20, 1994). He moreover requests that this subclass be recertified on an opt-out basis pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

Amicus curiae further maintains that the entire notice procedure was deficient under Local Civil Rule 5 because it failed to disclose the *amount* of attorney's fees that class counsel would receive from Unisys pursuant to the Stipulation of Settlement. The notice to the class members had instead informed the same that Unisys had consented to the payment of *reasonable* attorney's fees and costs for Class Counsel with funds entirely separate from those used to pay the class members' benefits.

The Court regards these incipient arguments most curiously, especially in view of the stage to which the litigation has advanced. Indeed, neither of these arguments were raised by Mr. Wasserman when he sought permission to intervene in this action, or at the June 3, 1994 fairness hearing. Further, these arguments have no bearing whatsoever with respect to this action on the interests of the nonclass members that he purports to represent; rather these contentions seek only to impugn the effectiveness of class counsel, and to attack the adequacy of the notice sent to the class members.

In view of the fact that the proposed final judgment, as discussed *infra*, does not profess to adjudicate the rights of the persons he purports to represent and amicus curiae has not argued otherwise, the Court finds that Mr. Wasserman has no standing to maintain any claims bearing upon the sufficiency of notice to the class members. Nevertheless, the Court, in light of its fiduciary role, shall consider these assertions from the independent vantage point of whether the notice to the class members has satisfied due process and Rule 23 of the Federal Rules of Civil Procedure.

## 2. *Analysis*

With respect to the issue of the putative reserve fund, the Court notes that even before Mr. Wasserman raised this issue in his brief to the Court, class counsel, in connection with the fairness hearing, addressed it by affidavit. *See* Aff. of Class Counsel in Support of the Fairness of the Settlement ¶¶ 29–32, at 12–14. Specifically, class counsel attests that at a relatively early stage in the settlement process, he "became aware that Unisys and its predecessors had set money aside to pay for post-retirement medical benefits." *Id.* ¶ 29, at 12. He further states that at a conference presided by the Honorable Reena Raggi, United States District Judge for the Eastern District of New York—to whom this case had been originally assigned—class counsel cautioned that before a settlement could be finalized, the plaintiffs had to satisfy themselves that the money being used to fund the trust accounts for subclasses 7, 8 and 9 hadn't already been earmarked for the same Great Neck subclasses, i.e., that it wasn't settling with its own money. *Id.* ¶ 30, at 12–13.

A unique form of discovery thereafter commenced whereby Unisys provided class counsel with confidential documents, work product and attorneys' opinion letters, in an effort to convince them that the use of the money set aside by Unisys was not limited to providing health benefits to retired union members from the Great Neck facility. Upon reviewing these documents and discussing them with experts, class counsel reached a series of conclusions. They included the following:

[1] It would be extremely difficult if not impossible to tie any particular transaction in which money was set aside to any particular government contract [with the Department of Defense providing for the expenditure of certain health benefits.]

[2] Monies were deposited in several places for this purpose. Essentially, Sperry [Unisys' corporate predecessor] and Unisys created a number of "pockets" into which the excess funds were held. One was the GAC 1150. Separate accounts were also created in the "GAC 50," in a Connecticut General Annuity Account and in the overall "Harris Trust," through which most of the Unisys/Sperry Trust benefits were funded and paid.

[3] While a "Restricted Portion" was created by amendment of the GAC 1150, *there was nothing in that document which clearly vested these contributions in any group of employees or prohibited Unisys from transferring this money.*

[4] Sperry and then Unisys had been urged by their actuaries for many years to remove the "post-retirement medical insurance money" from the various segregated accounts and pool it with all the other money held in the Harris Trust for the payment of health benefits. The actuaries assured the Company that such a transfer would be legal. Unisys resisted this ... but finally did transfer the money to the Harris Trust in 1992.

[5] Unisys provided [class counsel] with an opinion letter, which states that the transfer of money to the Harris Trust is permissible under the law and that none of the money set aside for retiree medical benefits can be said to be reserved for any individual or group.

*Id.* ¶ 31, at 13–14 (emphasis added). Class counsel further describes how their foregoing conclusions impacted on their settlement negotiations:

Having reviewed all of the foregoing documents and having determined what had occurred, we were still not absolutely convinced that the monies set aside for retiree health insurance had been earmarked for Great Neck bargaining unit retirees. However, we were convinced that it would be extremely difficult to prove this.

Instead, we were able to use the uncertainty with respect to these potential claims to extract a settlement which included the trust provisions of which this Court is aware.

*Id.* ¶ 32, at 14.

Turning to the notice of proposed settlement that was sent to the members of subclass 8, the portion that describes the relevant claims to be released reads as follows:

On or about December 4, 1992, Plaintiffs in Civil Action No. 92 Civ. 5719, individually and/or on behalf of a purported class of

retired IUE-represented bargaining-unit employees of Unisys or its predecessor, commenced an action against the Settling Defendants. On or about February 24, 1993, Plaintiffs in Civil Action No. 93 Civ. 839, individually and/or on behalf of a purported class of retired IBEW-represented bargaining-unit employees of Unisys or its predecessor, commenced a separate action against the Settling Defendants.

The Complaints in both cases assert various claims under the Labor Management Relations Act ("LMRA"), the Employee Retirement Security Act of 1974, as amended ("ERISA"), and federal common law. The Complaints allege, among other things, that Unisys breached certain collective bargaining agreements it entered into with the IUE and the IBEW, and that the Settling Defendants are responsible for paying for certain retiree medical benefits allegedly due the Settlement Class under these collective bargaining agreements. The two actions have been consolidated into one case, and the Complaint in 92 Civ. 5719 has been amended to include additional Unisys retirees.

Preliminary Order Ex. B8, at 7 (E.D.N.Y. Apr. 8, 1994).

In view of the privileged nature of the information in question which was obtained for settlement purposes solely and exceeded the bounds of normal discovery—and more importantly, in light of the overall comprehensive and scrupulously neutral nature of the notices to the class members, *see supra* Background Part C, which described, *inter alia,* the nature of the plaintiffs' claims in a general manner—the Court finds that the notices sent to the class members, on balance, were " 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Weinberger v. Kendrick,* 698 F.2d 61, 71 (2d Cir.1982) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S.

306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *see also id.* at 70 ("[N]o rigid standards govern the contents of notice to class members. . . ."); *In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. 740, 759 (E.D.N.Y.1984) (Weinstein, J.) ("Due process does not require that a copy of the settlement agreement itself be attached to the notice. A general description of the settlement terms is sufficient.") (citations omitted), *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988).

The Court further finds that the notices sent to the class members complied with Local Civil Rule 5.[5] The notices sent to the members of each of the subclasses provide as follows:

> Unisys has agreed that it will consent to the payment of reasonable attorneys' fees and costs for Class Counsel. Such payment will be made with funds wholly separate from those which will be used to pay your benefits, and your benefits have not been affected or reduced in any way, either directly or indirectly, by the agreement to pay these fees and costs.

Language concerning attorney's fees was inserted in the notices upon the insistence of the Court which wished to inform the class members of the nature of the fee arrangement whereby class counsel would be compensated. The Court approved the foregoing language because a fee application specifying a particular amount would not be submitted until *after* the Court had approved the proposed settlement, provided that such contingency indeed occurred. While the Court recognizes that theoretically, because financial resources are limited, any contingent obligation to disburse funds in the future may diminish the monies allocated to a present

---

5. Local Civil Rule 5 provides in pertinent part: (a) Fees for attorneys or others shall not be paid upon the recovery or compromise in a derivative or class action on behalf of a corporation or class except as allowed by the court after a hearing upon such notice as the court may direct. The notice shall include a statement of the names and addresses of the applicants for such fees and the amounts requested respectively and shall disclose any fee sharing agreements with anyone. The court, in its discretion, may direct that the notice also be given the New York Regional Office of the Securities and Exchange Commission. Where the court directs notice of a hearing upon a proposed voluntary dismissal or settlement of [a] derivative [suit] or class action, the above information as to the applications shall be included in the notice.

commitment, the Court nevertheless regarded the foregoing language to be appropriate under the circumstances. The Court sees no reason to depart from this earlier ruling at this time.

In sum, the Court affirms its earlier determination that the notices sent to the class members satisfied due process and Rule 23(e) of the Federal Rules of Civil Procedure. Accordingly, the Court shall now turn its attention to whether the proposed settlement is fair and reasonable to each of the settling subclasses, and whether the proposed final order and judgment is no broader than necessary to adjudicate the rights of the persons represented in this action.

## DISCUSSION

I. *Fairness to Class Members*

The approval of a settlement in a class action is a matter of discretion for the trial court. . See *In re Ivan F. Boesky Sec. Litig.,* 948 F.2d 1358, 1368 (2d Cir.1991); *In re Warner Communications Sec.Litig.,* 798 F.2d 35, 37 (2d Cir.1986); *Newman v. Stein,* 464 F.2d 689, 692 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *In re McDonnell Douglas Equip. Leasing Sec. Litig.,* 838 F.Supp. 729, 737 (S.D.N.Y.1993). In evaluating a proposed settlement, the court must determine whether " 'the compromise is fair, reasonable and adequate.' " *In re Masters Mates & Pilots Pension Plan and IRAP Litig.,* 957 F.2d 1020, 1026 (2d Cir.1992) (quoting *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983)). Mindful of the public policy concerns—including the finite nature of judicial resources—that favor settlements, yet cognizant of the potentially vulnerable position of dissenting class members, the court's role "is to reach an objective, educated estimate of the complexity and probable success of full litigation, together with all other factors relevant to a fair evaluation of the wisdom of the proposed compromise." *In re Baldwin–United Corp. (Single Premium Deferred Annuities Ins. Litig.),* 607 F.Supp. 1312, 1320 (S.D.N.Y.1985) (citation omitted). In so doing, the district court "has

the fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately." *Warner Communications,* 798 F.2d at 37 (citations omitted).

The standards governing a proposed class action settlement have been articulated as follows:

First, the proponents have the burden of proving that (1) the settlement is not collusive but was reached after arm's length negotiations; (2) the proponents are counsel experienced in similar cases; (3) there has been sufficient discovery to enable counsel to act intelligently; and (4) the number of objectants or their relative interest is small. If the proponents establish these propositions, the burden of attacking the settlement then shifts to the objectants, if any. Finally, the Court must approve the settlement only after finding it to be reasonable in light of the plaintiffs' ultimate probability of success in the lawsuit.

*McDonnell Douglas,* 838 F.Supp. at 737 (quoting *Breiterman v. Roper Corp.,* [1989–1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,885, at 94,831, 1990 WL 15535 (S.D.N.Y. Jan. 12, 1990)). In addition to these requirements, the court—as a fifth threshold matter—must be satisfied that notice has been provided to all class members in accordance with the manner that the court has directed. *See* Fed.R.Civ.P. 23(e) ("[N]otice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."); *McDonnell Douglas,* 838 F.Supp. at 737.

The Court finds that the proponents have met their initial burden of proving that the settlement is not collusive, that the settling plaintiffs and settlement class members are represented by counsel with extensive experience in similar matters, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectors or their relative interest is small. Further, the Court finds that nearly all class members have received notice of the proposed settlement in accordance with the manner that the Court has directed.

First, the Court is satisfied that the proposed settlement was reached upon arm's length negotiations. Indeed, the parties have repeatedly sought to involve the Court in the settlement of this case.

In addition, the negotiations were conducted by highly competent counsel who have extensive experience in the handling of class actions, in labor-management collective bargaining, and in employee/retiree benefit issues. Together, class counsel have spent decades representing individuals and organized labor in the practice of labor and employment law. Class counsel have expressed their own opinion that the proposed settlement is fair, reasonable and adequate and the opinion of such experienced and competent counsel is consequently accorded great weight. *See Weinberger v. Kendrick,* 698 F.2d 61, 75–76 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *McDonnell Douglas,* 838 F.Supp. at 740. Further to this point, in analyzing a proposed settlement, " '[c]ourts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching.' " *McDonnell Douglas,* 838 F.Supp. at 737 (quoting *Oppenlander v. Standard Oil Co. (Indiana),* 64 F.R.D. 597, 624 (D.Colo.1974)). The record reveals no evidence of fraud or overreaching.

Moreover, the parties entered into the proposed settlement after having completed a significant amount of discovery and investigation, both formal and informal, which has enabled counsel and their clients to act intelligently and on an informed basis in assessing the strength and weaknesses of their cases and the merits of settling this dispute in lieu of continued litigation. Class counsel has also engaged actuarial consulting firms, including representatives of the Segal Company and Foster Higgins & Company, to assist them in the evaluation of the discovery materials and in formulating proposals for settlement.

Further, the number of settlement class members communicating to the Court and their relative interest is small and unremarkable in light of the number of persons covered by this settlement, and in light of the nature of the comments received. Specifical-

ly, as earlier discussed, in no case did more than 5.88% of any settlement subclass submit letters to the Court in connection with the proposed settlement (i.e., subclass 6), and many of these letters did not express opposition to the settlement, but rather regarded the settlement as an unavoidable consequence of a complex and uncertain litigation. *See supra* Background, Part D.

The Court is also satisfied that notice has been provided to the class members in accordance with the manner that the Court has directed, and that based upon the evidence presented, it is certain that nearly all class members received one of the notices through the mail. Aside from the affidavits submitted by class counsel attesting to counsel's compliance with the Court's Preliminary Order dated April 8, 1994, as earlier discussed, strong assurance exists that almost all of the class members in this action have learned of the proposed settlement. *See supra id.* Part C. Class counsel has testified to its continual updating of the class member mailing list that was originally provided by Unisys with respect to those former employees who participated in Unisys' insurance programs that are the subject of the instant litigation. Counsel has further testified that this list was tested prior to the Court's approval of notice through informal mailing to class members to alert them of information meetings concerning the impending settlement, and that it diligently followed up upon those notices that were returned to counsel indicating an incorrect address. Moreover, class counsel established and maintained a toll-free "800" telephone number for the purpose of handling inquiries or questions about the Court's procedures regarding this case and the terms of the proposed settlement. *See* Aff. of Notification to Class (E.D.N.Y. June 2, 1994).

Insofar as the proponents of the settlement have met their initial burdens, the Court now turns to assess whether the settlement is reasonable in light of plaintiffs' probability of success on the merits. "In undertaking this analysis, courts within the Second Circuit have not applied any single, inflexible test." *McDonnell Douglas,* 838 F.Supp. at

738. Rather, courts have considered the following relevant factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974) (citations omitted); *see McDonnell Douglas*, 838 F.Supp. at 738. In applying these numerous factors, the Court is mindful that it need " 'not decide the merits of the case or resolve unsettled legal questions.' " *McDonnell Douglas*, 838 F.Supp. at 739 (quoting *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998–99 n. 14, 67 L.Ed.2d 59 (1981)).

■ Based upon all the evidence presented, the settlement appears reasonable in light of the plaintiffs' probability of success on the merits, the recovery possible, and the attendant risks of litigation. Specifically, due to the number of local unions involved, the dozens of different collective bargaining agreements and governing plan documents that might be applicable from an evidentiary standpoint, and the more than 25–year period of time covered by the complaints, this is an extremely complex case and it is unlikely that this matter would be concluded for years if litigated through the likely appeals that would follow a trial. In addition, this litigation is being prosecuted in the face of vigorous opposition, as the settling defendants are also represented by highly competent counsel with extensive experience in ERISA and LMRA litigation matters, class actions and class action settlements. The settlement class members have reacted to the settlement in an overwhelmingly positive manner with only 1.37% of the settlement class—and no more than 5.88% of any individual subclass—voicing any type of concern or response. Further, the parties entered into settlement negotiations only after litigating this case for seven months and after much discovery had already been completed.

In view of the facts and the existing precedent in the Second Circuit, *see, e.g., Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488 (2d Cir.1988), there is a significant risk that the plaintiffs might not be able to establish liability on the part of the defendants as to one or more of the settlement subclasses. Moreover, even if plaintiffs were to succeed in establishing defendants' liability, it is unlikely that the plaintiffs could recover all aspects of the relief sought. Plaintiffs have obtained certain remedies available only through this settlement. These remedies include the security of a trust device for subclasses 7, 8 and 9 that arguably places these subclasses in a superior position to that of an unsecured judgment creditor which otherwise would be subject to the credit risk of the defendants.

The value of the benefits conferred upon the class members as a result of the settlement, as compared to the maximum possible recovery that the class members could receive if the case proceeded to trial, also weighs in favor of the Court's approval of the settlement. According to the supplemental affidavit submitted by class counsel, no subclass is expected to receive less than 60% of the benefits that would be attainable if the plaintiffs prevailed at trial. *See supra* Background Part E. While the Court recognizes that the projections provided by class counsel are mere estimates, and moreover, come unaccompanied by an independent evaluation of an actuarial firm—except to compare the various components of the settlement benefit package to those obtained under other settlement agreements, *see* Levy Aff. (E.D.N.Y. June 1, 1994), and to contrast the participant contribution schedule with respect to subclass 8 to the prescription drug costs incurred by a typical Medicare-eligible retiree under a Major Medical plan, *see* Supplemental Declaration of Everett E. Lewis in Support of the Fairness of the Settlement, Ex. A (E.D.N.Y. June 9, 1994) (Letter of Jonathan Parker to James Mauro, Esq. dated June 7, 1994)—the Court regards these estimates to

constitute further indicia in support of the fairness of the settlement to the class members. *See Grinnell*, 495 F.2d at 455 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."). Indeed, in matters involving the accessibility of specified health benefits to retired individuals, the security of a known level of medical coverage, albeit a function of compromise, may well outweigh the prospect of optimum litigation success when discounted by the risk of failure and the delays of protracted litigation. The unquantifiable value of an expeditious resolution to an elderly person is not to be overlooked in assessing the reasonableness of a proposed settlement. The Court therefore concludes that the relative value of the benefits achievable through settlement suggests a finding that the proposed settlement is reasonable, fair, and adequate to the class members.

As the foregoing discussion has indicated, continued litigation in the instant consolidated action would be complex and lengthy, with no guarantee of any recovery at all by the class members. Accordingly, in light of all the factors addressed above, the Court finds that the proposed settlement in all respects is fair, reasonable, and in the best interests of each of the settling subclasses.

## II. *Scope of the Final Judgment*

An additional concern arises in connection with the scope of the proposed final judgment submitted by the parties. In its Memorandum and Order dated May 17, 1994 which, *inter alia*, vacated that portion of the Court's Preliminary Order that had approved the issuance of a "Bar Notice" upon persons unrepresented in the instant action, the Court indicated that it would not approve any proposed settlement that purported to adjudicate rights with respect to unrepresented persons. *See* Memorandum and Order, 155 F.R.D. at 48. The Court moreover conferred amicus curiae status upon James Wasserman, Esq. of the law firm of Vladeck, Waldman, Elias, & Engelhard, P.C. to establish within this action a concrete adversity of interest that would allow any reservations concerning the scope of the proposed final order and judgment to be brought expeditiously to the Court's attention.

The proposed final order and judgment was fully submitted by the parties on June 10, 1994. Neither amicus curiae nor any other person has stated any objection to its scope.

The Court has reviewed in detail the proposed final order and judgment and finds that it does not purport to extinguish any rights of non-class members. The Court is aware that there are two pending actions, 92–CV–5389 and 94–CV–1965, that may purport to raise claims similar to those raised by the plaintiffs in the instant consolidated action and/or which may include claims in regard to certain monies in the Sperry Employees Welfare Benefit Trust, presently held and administered by the Harris Trust and Savings Bank [the "Harris Trust"], or other alleged trusts maintained now or in the past by Unisys. The proposed final order and judgment provides that it "shall not bar or determine any claim raised in such actions or in any future action brought on behalf of any person not a Settling Plaintiff of a Settlement Class Member in this Action." Final Order and Judgment, at 15 (E.D.N.Y. Aug. 1, 1994). It further provides that "all claims regarding the Harris Trust shall remain viable, and if it shall be determined that Unisys is required by law to deposit any monies from or into the Harris Trust, or monies in any other alleged trust, this settlement shall not bar any person or entity entitled to bring such a claim that is not a Settling Plaintiff or Settlement Class Member herein from bringing such a claim or seeking such a determination." *Id.* at 15–16. In view of this narrowly drawn language, the Court finds that the proposed final order and judgment is not overly broad, and that therefore this final hurdle to the settlement of the instant action has been cleared.

Finally, because counsel has diligently heeded the Court's instructions regarding the scope of the proposed final order and judgment—and moreover, because Unisys has withdrawn its motion to certify additional subclasses of unrepresented persons—the

**1268**

Court finds that the need for amicus curiae no longer obtains. Accordingly, the Court hereby decertifies Mr. Wasserman of amicus curiae status and withdraws its earlier instruction to counsel for the parties to serve copies of all correspondences to the Court with respect to the instant action upon Mr. Wasserman.

### CONCLUSION

The proposed settlement is approved. Fed.R.Civ.P. 23(e). In addition, amicus curiae is decertified of such status, and the Court withdraws its earlier instruction to counsel to serve copies of all correspondences to the Court with respect to the instant action upon James Wasserman, Esq.

A Final Order and Judgment, dated August 1, 1994, has been entered by the Court dismissing with prejudice the entirety of the instant consolidated action. As indicated therein, the Court retains jurisdiction for the purpose of enforcing the provisions of the Stipulation of Settlement and said Final Order and Judgment.

SO ORDERED.